Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
1390 Market St, Suite 200
San Francisco, CA 94102
Ph: 206-294-1348

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| BLAIR ARANDA and GREGORIO ARANDA, individually, and BLAIR ARANDA as the Personal Representative of the Estate of Brantley Aranda, | CIVIL ACTION NO. |
| | COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP |
| Plaintiff, | |
| v. | |
| META PLATFORMS, INC., formerly known as FACEBOOK, INC., | |
| | JURY DEMAND |
| Defendants. | |

"In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . ."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

Plaintiffs Blair Aranda and Gregorio Aranda, individually, and Blair Aranda, as the Personal Representative of the Estate of Brantley Aranda, bring this action against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta"), and allege as follows:

## I.      INTRODUCTION

### A.      Plaintiffs' Claims

1.      This product liability action seeks to hold Meta responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Defendants and, specifically, for injuries Meta caused Brantley Aranda resulting in his wrongful death.

2.      Brantley suffered injuries proximately caused by Meta's unreasonably dangerous and defective Facebook product, including but not limited to, addiction, anxiety, anger, depression, self-harm, suicidal ideation, and ultimately death. On September 4, 2019, after struggling with the harmful effects of Defendants' social media products, 17-year-old Brantley died by suicide.

3.      Meta's social media product likewise caused foreseeable harms to Plaintiffs Blair and Gregorio Aranda. Blair and Gregorio Aranda did not consent to Meta distributing or otherwise providing their child with access to harmful social media products and were emotionally and financially harmed by Meta's addictive design and distribution and provision of harmful social media products to their minor child.

4.      Meta's Facebook product contains unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Meta's minor users.

5.      Meta programs and operates its algorithms and social media products to engagement and profits over user safety. This includes designing and distributing inherently dangerous products that appeal to kids, and operating algorithms and other technologies in a manner that promotes and amplifies harmful content.

6.      Plaintiffs suffered several emotional, physical, and financial harms as a result—all of which are a symptom of the current health crisis among American youth and,

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

by natural and foreseeable extension, American families, caused by certain, harmful social media products such as the ones at issue in this case.

**B.     Meta Knows or Should Know of the Harm Its Products Cause**

7.     In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Meta's various social media products in their current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). Examples of the Facebook papers include and can be found at the following locations, to name only some examples:

8.     The Wall Street Journal and Digital Wellbeing published several of the Facebook Papers in November 2021,[1] including but not limited to,

a.   Social Comparison: Topics, celebrities, Like counts, selfies [Jan 2021 internal document reporting findings from a 9-country user survey (n=100,000) in Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, USA].

b.   Appearance-based Social Comparison on Instagram [Feb 2021 internal document reporting finding from a 10-country user survey (n=50,590) across Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, Mexico, USA].

c.   Mental Health Findings: Deep dive into the reach, intensity, Instagram impact, self-reported usage and support of mental health issues [2019 internal document reporting findings from a 6-country user survey (n=22,410) across Brazil, India, Indonesia, Japan, Turkey, USA].

d.   Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US [2020 internal document reporting findings from a one-country (US) qualitative research study (n = 15 for focus groups) with young Instagram users (aged 13-21, supplemented by online diaries (n = 10) and video interviews (n = 7)].

e.   Teen Mental Health Deep Dive [2019 internal document reporting findings from a 2-country (UK and US) qualitative research study (n = 40 in-person interviews, with follow-up video calls (n = 8) with young Instagram users (aged 13-17), supplemented by online survey (n = 2,503)].

---

[1] https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

    f.   <u>Teens and Young Adults on Instagram and Facebook</u> [2021 internal document reporting findings from a five-country study (Australia, France, Great Britain, Japan, USA) with user data].

9.    Gizmodo has been publishing the Facebook Papers, several at a time, also starting in November 2021,[2] including but not limited to,

    a.   Why We Build Feeds

    b.   Is Ranking Good

    c.   Big Levers Ranking Experiment

    d.   [LAUNCH] Civic Ranking: Engagement-Based Worth Your Time

    e.   MSI Metric Note Series

    f.   The Meaningful Social Interactions Metric Revisited: Part 2

    g.   The Meaningful Social Interactions Metric Revisited: Part 4

    h.   The Meaningful Social Interactions Metric Revisited: Part 5

    i.   Meaningful Social Interactions Useful Links

    j.   MSI Documentation

    k.   Evaluating MSI Metric Changes with a Comment-Level Survey

    l.   Surveying The 2018 Relevance Ranking Holdout

    m.  Overview of MSI + Pages and Survey Research

    n.   Is Multi-Group Picker "Spammy?"

    o.   Filtering Out Engagement-Bait, Bullying, and Excessive Comments From MSI Deltoid Metric

    p.   [LAUNCH] Using p(anger) to Reduce the Impact Angry Reactions Have on Ranking Levers

    q.   Planned MSI Metric Changes in 2020

    r.   MSI Metric Changes for 2020 H1

    s.   Should We Reduce the MSI Weight of Sticker Comments?

    t.   Max Reshare Depth Experiment

    u.   "Understand This Post's Ranking" —How I Miss Thee!

[2] https://gizmodo.com/facebook-papers-how-to-read-1848702919

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

v.   Facebook and Responsibility

w.   The Surprising Consequences to Sessions and MSI Caused by Turning Off Video Autoplay on News Feed

x.   One-Go Summary Post for Recent Goaling and Goal Metric Changes for News Feed

y.   News Feed UXR Quarterly Insights Roundup

z.   What Happens If We Delete Ranked Feed?

aa.  News Feed Research: Looking Back on H2 2020

bb.  Content from "Political" Pages in In-Feed Recommendations

cc.  Political Content in In-Feed Recommendations (IFR)

dd.  In-Feed Recommendations HPM —April 15 2021

10.    These documents and articles referencing these documents are incorporated by reference into this Complaint. The sole reason they are not attached is length and file size. However, the contents of these documents and other Facebook Papers is material to Plaintiffs' claims.

11.    What the Facebook Papers also establish, is that Meta's social media products—including Facebook—are highly addictive and harmful to a significant population of all users, including and especially teens; that certain design features that serve no functional purpose (for example, "likes," filters, and product designs that actively encourage addiction) are harming users; and that algorithms and algorithm-driven product features are dangerous and harmful by design and as designed.

12.    Despite knowledge of the dangerous and harmful characteristics of their products, Meta has made and continue to make calculated cost-benefit business decisions and is consistently prioritizing its already astronomical profits over human life.

C.    **The Social Media Epidemic Among Children**

13.    On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages 12 to 16 in the U.S. increased

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

a staggering 146 percent. Several cities across the United States have been experiencing teen suicide rates in the range of 1 every year or other year, which is an absolute crisis for our country—the death by suicide of a child is something that should be an exception and not a rule. The incidence of serious depression and dissatisfaction with life in this age group has likewise increased dramatically, and there is no question that these harms relate in no small part to companies like Defendants.

14.     The most significant and far-reaching change to the lives of young people in the last ten years has been the widespread adoption of social media platforms and prominently, for purposes of this lawsuit, the Facebook product, which is designed and distributed by Meta.

15.     By 2014, 80 percent of high-school students said they used social media daily, and 24 percent said that they were online "almost constantly."

16.     In April of 2018, an estimated 47% of all American teens aged 13 to 14 used Facebook and an estimated 54% of all American teens aged 15 to 17 used Facebook.[3]  This equates to millions of at-risk teenage Facebook users in the United States alone.

17.     Teens make up a significant percentage of all social media users and, in the United States, they represent Meta's only significant opportunity for growth due to saturation of the adult market. Meta sees them as a gateway for other potential users, that is, they use U.S. teens to recruit parents and adult relatives as well as younger siblings – including pre-teen siblings Meta is not permitted to provide accounts to but to whom Meta does provide accounts, by simply refusing to verify age and identification on the front end and then by turning a blind eye where possible and in the interest of profits. On information and belief, U.S. teens also are the most lucrative for Meta when it comes to advertising revenue.

**D.     Disparities Between Public Statements and Harm to Children**

18.     Peer reviewed studies and available medical science have also identified a particular type of social media and electronic device use associated with major mental health

---

[3] https://www.statista.com/statistics/419360/us-teen-facebook-users-age-reach/

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Large observational studies and experimental results also point to heavy use of certain social media products as cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls. Meta has spent years publicly denying these findings—while internally confirming them.

19.     Specifically, Meta leadership has vehemently denied that its products are harmful or addictive. Meta has gone to great lengths to assure the world that its social media products are safe, and makes extensive safety-related representations in its Terms of Service for Facebook (effective January 4, 2022),

- **Combat harmful conduct and protect and support our community:** People will only build community on Meta Products if they feel safe and secure. We work hard to maintain the security (including the availability, authenticity, integrity, and confidentiality) of our Products and services. We employ dedicated teams around the world, work with external service providers, partners and other relevant entities and develop advanced technical systems to detect potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community, including to respond to user reports of potentially violating content. If we learn of content or conduct like this, we may take appropriate action based on our assessment that may include – notifying you, offering help, removing content, removing or restricting access to certain features, disabling an account, or contacting law enforcement. We share data across **Meta Companies** when we detect misuse or harmful conduct by someone using one of our Products or to help keep Meta Products, users and the community safe. For example, we share information with Meta Companies that provide financial products and services to help them promote safety, security and integrity and comply with applicable law. Meta may access, preserve, use and share any information it collects about you where it has a good faith belief it is required or permitted by law to do so. For more information, please review our **Privacy Policy**.

*See* Facebook Terms of Service, ¶ 1.

20.     Despite Meta's representations that it is providing a "safe and secure" platform and that it utilizes its technology to the utmost to keep its users safe, Meta's own internal research proves the opposite. The Facebook Papers include years' worth of studies and reports discussing the fact that Facebook is addictive and harmful, and that use of Facebook can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, sleep deprivation, and what Meta refers to

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

internally as "SSI" – which stands for Suicide and Self Injury.[4]

21.     Meta has denied for years that its products are harmful or addictive while, in fact, its products *are* harmful and addictive, and Meta knows it. Meta knew the truth and chose to conceal it and to not disclose to the public or parents of young users, as Meta knew that such disclosure would prevent it from further growth and development of these products and product features.

22.     Moreover, Meta's Facebook social media product contains unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Meta's minor users and their families. To name only one example, at all times relevant, when a use tried to leave Facebook they would get a series of messages intended to aggressively convince them to stay.  This includes photos of loved ones with captions letting the user know that they would no longer be able to keep in touch if they chose to de-activate.  In short, addicted users often try to deactivate their account as a means of detoxing from Meta's addictive social media product, in response to which Meta has designed a product feature that dissuades those addicted users from detoxing. These Facebook features and designs have nothing whatsoever to do with functionality of the product, communication, or third-party content – they are aimed solely at keeping users addicted to the product, no matter how harmful that addiction may be.

23.     Meta knows exactly the harms that its Facebook product has caused and is still causing yet remains focused on maintaining and increasing user engagement which translates into greater profits for Meta. On information and belief, there have been studies dating back almost a decade on related topics, which studies are not known or, in some cases, even made available to the general public; but Meta knew or should have known about these studies as, often times, they related to the products being designed and developed by Meta and Meta's scientists and/or engineers.[5]

---

[4] *See  https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/* ("'SSI' stands for suicide and self-injury.")
[5] *See, e.g.*, Sept. 30, 2021, Senate Hearing Transcript, at 1:07:47 (reference to study published in National Academy of Sciences "way back in 2014.").

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

24.     Meta also knows that its recommendations and other product features, that is, features whereby Meta promotes and/or send content to users and otherwise tries to connect users who, in fact, are often complete strangers, result in disproportionate harms to vulnerable users including children and teens. Yet Meta continues to reap astronomical profits at the expense of these users.

25.     For example, Meta has an algorithm that recommends "People You May Know" to users, which means that Meta suggests to users other users they may want to "friend" or "follow." These recommendation systems serve the singular purpose of making more money for Meta in that they are meant to keep users engaged through connections, which connections are suggested, prompted, and encouraged by Meta. But also, which connections involve complete strangers and where Meta's own recommendation system frequently makes and perpetuates harmful recommendations, as they did in the case of Brantley Aranda and millions of other teens.

26.     Likewise, Meta knows that its recommendation algorithms are responsible for the exposure of young users to harmful groups – including and, as relevant for purposes of this lawsuit, self-harm, eating disorder, even suicide-promoting groups which Meta, through its algorithms, actively recommends to children and teens on a regular basis.

27.     Meta also knows that its Facebook product is contributing to teen depression, anxiety, even suicide and self-harm. Why doesn't it change these harmful product features and stop utilizing algorithms in connection, at least, with teen accounts? Because Meta's top priority is growth and competition concerns, and Meta sees acquiring and retaining teens as essential to its survival. Teenagers spend significantly more time on social media than adults (both total time and user sessions—which are usage patterns linked to addiction), represent Meta's greatest (if not only) growth opportunity in the US, and can be used by Meta to recruit older and younger family members and friends.

28.     Meta also believes that teens are the best way to capture household adults and children. Pre-teens look to their older siblings in terms of which social media products to use and how to use them, and often obtain guidance from them to open their first account, while

parents and grandparents are influenced by teen household members and open accounts to participate in their child's life.

29.     Meta knew that its product was harming millions of its users, up to and including what Meta refers to as SSI (Suicide and Self-Injury). Yet Meta leadership chose *repeatedly* to ignore its own research and reject the recommendations of a small number of employees in favor of its own economic interests. In September of 2017, the New York Times published an article titled "Facebook's Frankenstein Moment,"[6] which discussed the fact that Facebook was enabling advertisers to target users with offensive terms. In that article, former Meta CEO, Sheryl Sandberg, was quoted as saying "We never intended or anticipated this functionality being used this way – and that is on us." Meta leadership lied or, at best, made material omissions meant to lull Americans into trusting Meta so that it could continue increasing its own growth and engagement with zero oversight and at the *anticipated* expense of human life.

30.     Specifically, there were many ways in which Meta employees could have anticipated, should have anticipated, and did anticipate harms that Meta's social media products – including and specifically Facebook – were causing. Meta leadership simply chose to ignore employees tasked with safety (referred to internally by Meta as "integrity") and refused to make changes in the interest of its bottom line.

31.     Meta launched new products and designs without safety testing, despite knowing that its products can cause harm.

32.     Meta launched new products and designs *even when* testing or analysis was done and red flags were raised internally about potential harms to users.

33.     Meta refused to fix identified harms, even when those harms were likely to cause suicide and self-injury in Meta's youngest users – children and teens.

34.     Instead of addressing known harms and risks to users, Meta leadership has taken to ridiculing and ostracizing conscientious employees who try to sound the alarm, as

---

[6] https://www.nytimes.com/2017/09/21/technology/facebook-frankenstein-sandberg-ads.html

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

means of silencing potential opposition.

35.     Meta anticipated the harms its products would cause, and moved forward with them anyway, resulting in the harms at issue in this complaint.

36.     Meta also knows that constant comparison on social media is the reason' why there are higher levels of anxiety and depression in young people. Harmful social comparison is the result of social media's design and operation, not some third-party publisher. For example, addictive design elements that are intended to and do addict young users, *i.e.* push notifications, reward systems, continuous scroll feature, and the "like" button; harmful social comparison features that serve no informational purpose, *i.e.* filters and the "like" button; and decisions Meta makes with regard to the types of advertisements and other content Meta promotes and amplifies, and even which users it will direct that content towards in its goal of increasing engagement at any cost.  These are deliberate choices being made by Meta, and Meta alone.

37.     The Facebook product includes multiple product features that cause harm to teen users. For example, product features that enable users to like or love other user's content results in increased addiction and social comparison harms.

38.     Meta's Direct Message feature also restrictions when it comes to teens and children. Meta encourages children and teens to use its social media product, then its makes those children and teens accessible to strangers (for example, by permitting public profiles and/or viewing of content posted by these children and teens), then it provides predators with a direct means of communication (Direct Messaging features).

39.     On information and belief, Meta is incredibly guarded when it comes to the types of data it collects, to the point where it will not even disclose certain, critical information to parents and/or police and other law enforcement upon request.

40.     Meta knows that teens are more vulnerable and suffer harms from use of its social media products at higher rates than adult users. Meta also knows that teens access social media longer and more often than adults. Advertisers are willing to pay a premium for unfettered access to child and teens so Meta, in turn, works hard to make its social media

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

products as appealing to teens as possible, even though they are harmful to teens.

**E.    Meta Focuses on Profits Over Safety**

41.    Meta knows the harmful impact its Facebook social media product has. Instead of warning users and/or re-designing its product to make it safer, however, Meta chooses enhancing profits over protecting human life.

42.    The problematic use identified in medical literature is precisely the type of use Meta has designed its products to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

43.    Meta slowly switched its News Feed (in its Facebook and Instagram products) from maximizing time-spent to maximizing sessions, even though it knew that maximizing sessions is harmful to its users. Meta also knows that its "like" button causes harmful social comparison, and results in anxiety and depression in teens. Meta has repeatedly refused to protect its users from harm for fear of offending other users, decreasing teen engagement, and/or losing revenue from its advertisers as a result.

44.    Ultimately, Meta has control over its technology and product design and how it is used and implemented. Meta can protect children, but in every case, Meta has chosen instead to make its Facebook product more popular and more accessible – at the cost of the health and wellbeing of their young users. In other words, Meta knows that its products are harmful and dangerous, could make them less harmful and less dangerous, but opt instead for attracting and retaining new users (valuing profits ahead of safety).

45.    In other words, Meta is perfectly capable of enforcing its own Terms of Service, Community Standards, and other guidelines, with minimal cost. It can adjust controls in a manner that would better protect its users, especially children and teens, from certain, significant harms caused by Meta's user setting options, recommendations, and other algorithmic-driven product features. Yet, Meta repeatedly conducts its engagement-driven, cost-benefit analysis and repeatedly chooses profit over human life. That is not a choice Meta has the right to make.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

46.     Meta leadership has structured its three main groups—integrity, growth, and engagement—in a manner that actively frustrates and prevents the integrity group from making meaningful changes for the protection of its users. More to the point, Meta leadership places no such barriers when it comes to growth and engagement. Instead, Meta develops and implements products and product features in a manner that deliberately fails to account for the safety of its users—including millions of children and teens in the US alone.

47.     Upon information and belief, Meta senior leadership repeatedly refuses to take action on serious integrity issues unless it believes that it has no other choice—that is, Meta will not fix product defects (even where needed to save human lives) unless it its convinced that the financial and public opinion cost of doing nothing will be greater than the impact on its revenue of doing what is legally and ethically required.

48.     Nor does Meta intend to make the changes necessary to protect young users. For example, after the Facebook Whistleblower came forward and the first products liability lawsuits were filed, Meta began making small product changes, in an effort to mimize the impact of the truth about the harmfulness of its products. But Meta's new claims of prioritizing user safety are as false as the prior ones.

**F.      Overview of Claims**

49.     Plaintiffs bring claims of strict liability based upon Meta's defective design of its Facebook social media product that renders such product not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Meta's product with a negligible increase in production cost.

50.     Meta has consistently and knowingly placed its own profit over the health and welfare of its teen and child users, recognizing astronomical gains at their expense.

51.     Plaintiffs also bring claims for strict liability based on Meta's failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms arising from foreseeable use of its Instagram social media product. The

addictive quality of Facebook and its harmful algorithms are unknown to minor users and their parents.

52. Plaintiffs also bring claims for common law negligence arising from Meta's unreasonably dangerous Facebook social media product and its failure to warn of such dangers. Meta knew, or in the exercise or ordinary care should have known, that its social media product was harmful to a significant percentage of its minor users and failed to redesign its product to ameliorate these harms. Meta also failed to warn minor users and their parents of foreseeable dangers arising out of use of its Facebook product.

53. Meta's own former and/or current developers often do not allow their own children and teenagers to use the Facebook product. For many years, Meta has had actual knowledge that its Facebook social media product is dangerous and harmful to children but actively concealed these facts from the public and government regulators and failed to warn parents about this known harm for continued economic gain.

54. Plaintiffs bring claims for fraud and fraudulent concealment. Meta spent years lying to Congress and the public about the nature of its products and harms they cause. Meta made affirmative statements and material omissions of fact designed to lull potential users into trusting that their social media products were safe, and that Meta was prioritizing user safety over its own profits, and Plaintiffs reasonably relied on those affirmative statements and material omissions of fact. Meta not only knew that its statements were false, but Meta and its leadership actively concealed the truth by lying to the public and, further, by creating a corporate culture of fear – conscientious Meta employees were made to believe that they would be ruined and not believed, and that their actions would result in others not being able to effectuate change from the inside if they revealed the truth. Meta knew that its products were not safe and that children like Brantley Aranda would be harmed by their use. Had Plaintiffs known the truth, they would never have allowed Brantley Aranda to use Meta's Facebook social media product.

55. Plaintiffs' claims do not arise from third party content, but rather, Defendants' product features and designs, including but not limited to algorithms and other product

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

features that addict minor users, amplify and promote harmful social comparison, affirmatively select and promote harmful content to vulnerable users based on their individualized demographic data and social media activity, direct harmful content in great concentrations to vulnerable user groups, put minor users in contact with dangerous adult predators, enable and encourage minors to hide harmful content from their family and friends, encourage and facilitate exploitation and abuse of minors through marketing, recommendation and messaging features, and data policies involving the concealment and/or destruction of information necessary to the protection of minors, and otherwise prioritize engagement (and Defendants' profits) over user safety.

## II.     PARTIES

56.     Plaintiffs Blair and Gregorio Aranda are individuals residing in Jonesboro, Louisiana, and Plaintiff Blair Aranda is in the process of being appointed the administrator of the Estate of her son, Brantley Aranda, who died on September 4, 2019. Plaintiffs have not entered into any User Agreements or other contractual relationship with Meta in connection with Brantley Aranda's use of its social media product. As such, in prosecuting this action Plaintiffs are not bound by any arbitration, forum selection, choice of law, or class action waiver set forth in said User Agreement(s). Additionally, as Personal Representative of the Estate of Brantley Aranda, Plaintiff Blair Aranda expressly disaffirms all User Agreements with Meta into which her son may have entered.

57.     Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Facebook and Instagram social media platforms, application that are widely available to users throughout the United States.

## III.     JURISDICTION AND VENUE

58.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiff and Defendants are residents and citizens of different states.

59.     This Court has personal jurisdiction over Defendant Meta because it

is headquartered and has its principal place of business in the State of California. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant Meta's principal places of business is in the Northern District of California.

## IV.   DIVISIONAL ASSIGNMENT

60.    The case is properly assigned to the San Francisco Division pursuant to Civ. L. R. 3-2(c)–(d) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in San Mateo County, where Defendant Meta Platforms, Inc. maintains its primary place of business.

## V.   FACTUAL ALLEGATIONS

### A.  Facebook Background and Products

61.    Facebook is an American online social network service that is part of the Meta Platforms. Facebook was founded in 2004, at which time, Facebook was nothing like the product it is today. In fact, when Facebook was first founded, only students at certain colleges and universities could use the social media product – and verification of college enrollment was required to access the social media product. This verification mechanism was a product feature having nothing to do with communication or operation of the Facebook social media product; and further, if that verification mechanism had been kept in place, Brantley Aranda would not have become addicted to the Facebook social media product, which addiction and related harms ultimately lead to his death.

62.    In 2005, Facebook expanded and became accessible to students at twenty-one universities in the United Kingdom and others around the world. Meta launched a high school version of its Facebook product, which Meta CEO and majority shareholder, Mark Zuckerberg referred to as the next logical step. Even then, however, high school networks required an invitation to join.

63.    Facebook later expanded eligibility to employees of several companies, including Apple Inc. and Microsoft. On December 11, 2005, Facebook added universities in Australia and New Zealand to its network and, in September 2006, Facebook opened itself up to everyone. At the time, Facebook claimed that it was open only to persons aged 13 and

16

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

older and with a valid email address, *however,* on information and belief, Facebook made the decision to no longer require verification of age and/or identity and did not actually verify user email address, such that underage users could literally enter nonsense email addresses and would be provided by Meta with access to a Facebook account.

64.     Meta's history proves that Meta knows how to implement product features meant to restrict access to persons above a certain age or even employed in certain industries and at certain companies. Meta's initial audience was limited to college students and older, but in 2006, Meta made the deliberate, business decision to instead begin distributing its product to everyone in the world with wi-fi access, regardless of the consequences.

65.     Facebook then underwent a series of significant product changes, aimed at increasing user engagement and product growth, but again, without regard to user safety. To name only some examples,

a.   In February 2009, Facebook launches the "like" button.

b.   In August and October of 2011, Facebook launches Facebook Messenger.

c.   In September 2011, Facebook increases the character limit for status updates from 500 to 5,000 (and later to 63,206) and starts allowing people to subscribe to non-friends.

d.   In January 2012, Facebook starts showing advertisements in its news feed, called Feature Posts at the time.

e.   In June 2012, Facebook launches Facebook Exchange (FBX), a real-time bidding ad system where advertisers can bid on users based on third-party websites visited by the users (as tracked by a cookie on the third-party website).

f.   In June 2013, Facebook launches Stickers.

g.   In March 2014, Facebook's facial recognition algorithm (DeepFace) reaches near-human accuracy in identifying faces.

h.   In April 2014, Facebook launches anonymous login so people can use its product without giving Facebook their data.

i.   In March 2015, makes clear that it wants to be an integrated bunch of apps, each fulfilling a somewhat different role. At the time, the company's leading applications include Facebook (its main app), Messenger, and externally built and acquired apps like Instagram and WhatsApp. Facebook announces changes to Facebook Messenger to make it more of a platform, things like a new real-time comments system, embeddable videos, and spherical video.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

j.  In June and July 2015, Facebook makes changes to its news feed algorithm, including use of information on how long people hover on a particular item to gauge levels of interest, in addition to activities it was already using (*i.e.* likes, comments, shares) as part of its algorithm and to determine what content to show Facebook users.

k.  In August 2015, Facebook launches its live-streaming product.

l.  In April 2016, Facebook launched more tools for Facebook apps and Facebook Live; in addition, it is now considering the time that a person spends reading content *off* Facebook as part of its news feed algorithm process.

m.  In November 2016, Facebook launches games for its social media product, so users can play without having to install new apps.

n.  In November 2017, Facebook launches Facebook Creator, which is an app for mobile video posts that helps with content creation.

o.  In November 2007, Facebook launches Facebook Beacon, which is part of Facebook's advertisement system that sends data from external websites to Facebook for the purpose of allowing targeted advertisements and allowing users to share their activities with friends.

66.    Throughout these product changes, re-designs, and launches, Facebook founder and CEO, Mark Zuckerberg, made public statements assuring the world that safety was Meta's (then Facebook) top priority. For example, in February of 2017, he made a post on his personal Facebook titled "Building Global Community," in which he talked at length about how Meta is focused on safety, how it intends to use its AI to the fullest to keep users safe, and how amazing Facebook is for bringing communities together, promoting critically important social groups, and other statements that we now know to be untrue, and profoundly dangerous, given what was actually happening at Facebook and what Mr. Zuckerberg knew about the harms his products were causing American youth. He wrote,

To our community,

On our journey to connect the world, we often discuss products we're building and updates on our business. Today I want to focus on the most important question of all: are we building the world we all want?

History is the story of how we've learned to come together in ever greater numbers -- from tribes to cities to nations. At each step, we built social infrastructure like communities, media and governments to empower us to achieve things we couldn't on our own.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

Today we are close to taking our next step. Our greatest opportunities are now global -- like spreading prosperity and freedom, promoting peace and understanding, lifting people out of poverty, and accelerating science. Our greatest challenges also need global responses -- like ending terrorism, fighting climate change, and preventing pandemics. Progress now requires humanity coming together not just as cities or nations, but also as a global community.

This is especially important right now. Facebook stands for bringing us closer together and building a global community. When we began, this idea was not controversial. Every year, the world got more connected and this was seen as a positive trend. Yet now, across the world there are people left behind by globalization, and movements for withdrawing from global connection. There are questions about whether we can make a global community that works for everyone, and whether the path ahead is to connect more or reverse course.

This is a time when many of us around the world are reflecting on how we can have the most positive impact. I am reminded of my favorite saying about technology: "We always overestimate what we can do in two years, and we underestimate what we can do in ten years." We may not have the power to create the world we want immediately, but we can all start working on the long term today. In times like these, the most important thing we at Facebook can do is develop the social infrastructure to give people the power to build a global community that works for all of us.

For the past decade, Facebook has focused on connecting friends and families. **With that foundation, our next focus will be developing the social infrastructure for community -- for supporting us, for keeping us safe, for informing us, for civic engagement, and for inclusion of all**.

Bringing us all together as a global community is a project bigger than any one organization or company, but Facebook can help contribute to answering these five important questions:

- How do we help people build supportive communities that strengthen traditional institutions in a world where membership in these institutions is declining?

- **How do we help people build a safe community that prevents harm**, helps during crises and rebuilds afterwards in a world where anyone across the world can affect us?

- How do we help people build an informed community that exposes us to new ideas and builds common understanding in a world where every person has a voice?

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

- How do we help people build a civically-engaged community in a world where participation in voting sometimes includes less than half our population?

- How do we help people build an inclusive community that reflects our collective values and common humanity from local to global levels, spanning cultures, nations and regions in a world with few examples of global communities?

My hope is that more of us will commit our energy to building the long term social infrastructure to bring humanity together. The answers to these questions won't all come from Facebook, but I believe we can play a role.

**Our job at Facebook is to help people make the greatest positive impact while mitigating areas where technology and social media can contribute to divisiveness and isolation**. Facebook is a work in progress, and we are dedicated to learning and improving. **We take our responsibility seriously, and today I want to talk about how we plan to do our part to build this global community**.

**Supportive Communities**

Building a global community that works for everyone starts with the millions of smaller communities and intimate social structures we turn to for our personal, emotional and spiritual needs.

Whether they're churches, sports teams, unions or other local groups, they all share important roles as social infrastructure for our communities. They provide all of us with a sense of purpose and hope; moral validation that we are needed and part of something bigger than ourselves; comfort that we are not alone and a community is looking out for us; mentorship, guidance and personal development; a safety net; values, cultural norms and accountability; social gatherings, rituals and a way to meet new people; and a way to pass time.

In our society, we have personal relationships with friends and family, and then we have institutional relationships with the governments that set the rules. A healthy society also has many layers of communities between us and government that take care of our needs. When we refer to our "social fabric", we usually mean the many mediating groups that bring us together and reinforce our values.

However, there has been a striking decline in the important social infrastructure of local communities over the past few decades. Since the

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

1970s, membership in some local groups has declined by as much as one-quarter, cutting across all segments of the population.

The decline raises deeper questions alongside surveys showing large percentages of our population lack a sense of hope for the future. It is possible many of our challenges are at least as much social as they are economic -- related to a lack of community and connection to something greater than ourselves. As one pastor told me: "People feel unsettled. A lot of what was settling in the past doesn't exist anymore."

**Online communities are a bright spot, and we can strengthen existing physical communities by helping people come together online as well as offline**. **In the same way connecting with friends online strengthens real relationships, developing this infrastructure will strengthen these communities, as well as enable completely new ones to form.**

A woman named Christina was diagnosed with a rare disorder called Epidermolysis Bullosa -- and now she's a member of a group that connects 2,400 people around the world so none of them have to suffer alone. A man named Matt was raising his two sons by himself and he started the Black Fathers group to help men share advice and encouragement as they raise their families. In San Diego, more than 4,000 military family members are part of a group that helps them make friends with other spouses. These communities don't just interact online. They hold get-togethers, organize dinners, and support each other in their daily lives.

We recently found that more than 100 million people on Facebook are members of what we call "very meaningful" groups. These are groups that upon joining, quickly become the most important part of our social network experience and an important part of our physical support structure. For example, many new parents tell us that joining a parenting group after having a child fits this purpose.

**There is a real opportunity to connect more of us with groups that will be meaningful social infrastructure in our lives**. **More than one billion people are active members of Facebook groups, but most don't seek out groups on their own -- friends send invites or Facebook suggests them**. If we can improve our suggestions and help connect one billion people with meaningful communities, that can strengthen our social fabric.

Going forward, we will measure Facebook's progress with groups based on meaningful groups, not groups overall. **This will require not only helping people connect with existing meaningful groups, but also enabling community leaders to create more meaningful groups for people to connect with**.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

The most successful physical communities have engaged leaders, and we've seen the same with online groups as well. In Berlin, a man named Monis Bukhari runs a group where he personally helps refugees find homes and jobs. Today, Facebook's tools for group admins are relatively simple. We plan to build more tools to empower community leaders like Monis to run and grow their groups the way they'd like, similar to what we've done with Pages.

Most communities are made of many sub-communities, and this is another clear area for developing new tools. A school, for example, is not a single community, but many smaller groups among its classes, dorms and student groups. Just as the social fabric of society is made up of many communities, each community is made of many groups of personal connections. We plan to expand groups to support sub-communities.

We can look at many activities through the lens of building community. Watching video of our favorite sports team or TV show, reading our favorite newspaper, or playing our favorite game are not just entertainment or information but a shared experience and opportunity to bring together people who care about the same things. **We can design these experiences not for passive consumption but for strengthening social connections**.

Our goal is to strengthen existing communities by helping us come together online as well as offline, as well as enabling us to form completely new communities, transcending physical location. When we do this, beyond connecting online, we reinforce our physical communities by bringing us together in person to support each other.

A healthy society needs these communities to support our personal, emotional and spiritual needs. In a world where this physical social infrastructure has been declining, we have a real opportunity to help strengthen these communities and the social fabric of our society.

**Safe Community**

As we build a global community, this is a moment of truth. Our success isn't just based on whether we can capture videos and share them with friends. **It's about whether we're building a community that helps keep us safe -- that prevents harm, helps during crises, and rebuilds afterwards.**

Today's threats are increasingly global, but the infrastructure to protect us is not. Problems like terrorism, natural disasters, disease, refugee crises, and climate change need coordinated responses from a worldwide vantage point. No nation can solve them alone. A virus in one nation can quickly spread to others. A conflict in one country can create a refugee crisis across

22

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

continents. Pollution in one place can affect the environment around the world. Humanity's current systems are insufficient to address these issues.

Many dedicated people join global non-profit organizations to help, but the market often fails to fund or incentivize building the necessary infrastructure. I have long expected more organizations and startups to build health and safety tools using technology, and I have been surprised by how little of what must be built has even been attempted. **There is a real opportunity to build global safety infrastructure, and I have directed Facebook to invest more and more resources into serving this need.**

For some of these problems, **the Facebook community is in a unique position to help prevent harm**, assist during a crisis, or come together to rebuild afterwards. This is because of the amount of communication across our network, our ability to quickly reach people worldwide in an emergency, and the vast scale of people's intrinsic goodness aggregated across our community.

**To prevent harm, we can build social infrastructure to help our community identify problems before they happen. When someone is thinking of committing suicide or hurting themselves, we've built infrastructure to give their friends and community tools that could save their life.** When a child goes missing, we've built infrastructure to show Amber Alerts -- and multiple children have been rescued without harm. And we've built infrastructure to work with public safety organizations around the world when we become aware of these issues. **Going forward, there are even more cases where our community should be able to identify risks related to mental health, disease or crime**.

To help during a crisis, we've built infrastructure like Safety Check so we can all let our friends know we're safe and check on friends who might be affected by an attack or natural disaster. Safety Check has been activated almost 500 times in two years and has already notified people that their families and friends are safe more than a billion times. When there is a disaster, governments often call us to make sure Safety Check has been activated in their countries. But there is more to build. We recently added tools to find and offer shelter, food and other resources during emergencies. Over time, our community should be able to help during wars and ongoing issues that are not limited to a single event.

To rebuild after a crisis, we've built the world's largest social infrastructure for collective action. A few years ago, after an earthquake in Nepal, the Facebook community raised $15 million to help people recover and rebuild -- which was the largest crowdfunded relief effort in history. We saw a similar effort after the shooting at the Pulse nightclub in Orlando when people across the country organized blood donations to help victims they

had never met. Similarly, we built tools so millions of people could commit to becoming organ donors to save others after accidents, and registries reported larger boosts in sign ups than ever before. **Looking ahead, one of our greatest opportunities to keep people safe is building artificial intelligence to understand more quickly and accurately what is happening across our community**.

There are billions of posts, comments and messages across our services each day, and since it's impossible to review all of them, we review content once it is reported to us. **There have been terribly tragic events -- like suicides, some live streamed -- that perhaps could have been prevented if someone had realized what was happening and reported them sooner**. **There are cases of bullying and harassment every day, that our team must be alerted to before we can help out. These stories show we must find a way to do more**. Artificial intelligence can help provide a better approach. **We are researching systems that can look at photos and videos to flag content our team should review**. This is still very early in development, but we have started to have it look at some content, and it already generates about one-third of all reports to the team that reviews content for our community.

**It will take many years to fully develop these systems**. Right now, we're starting to explore ways to use AI to tell the difference between news stories about terrorism and actual terrorist propaganda so we can quickly remove anyone trying to use our services to recruit for a terrorist organization. This is technically difficult as it requires building AI that can read and understand news, but we need to work on this to help fight terrorism worldwide. As we discuss keeping our community safe, it is important to emphasize that part of keeping people safe is protecting individual security and liberty. We are strong advocates of encryption and have built it into the largest messaging platforms in the world -- WhatsApp and Messenger. Keeping our community safe does not require compromising privacy. Since building end-to-end encryption into WhatsApp, we have reduced spam and malicious content by more than 75%.

The path forward is to recognize that a global community needs social infrastructure to keep us safe from threats around the world, and that our community is uniquely positioned to prevent disasters, help during crises, and rebuild afterwards. **Keeping the global community safe is an important part of our mission -- and an important part of how we'll measure our progress going forward**.

**Informed Community**

The purpose of any community is to bring people together to do things we couldn't do on our own. To do this, we need ways to share new ideas and

24

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

share enough common understanding to actually work together. Giving everyone a voice has historically been a very positive force for public discourse because it increases the diversity of ideas shared. But the past year has also shown it may fragment our shared sense of reality. It is our responsibility to amplify the good effects and mitigate the bad -- to continue increasing diversity while strengthening our common understanding so our community can create the greatest positive impact on the world.

The two most discussed concerns this past year were about diversity of viewpoints we see (filter bubbles) and accuracy of information (fake news). I worry about these and we have studied them extensively, but I also worry there are even more powerful effects we must mitigate around sensationalism and polarization leading to a loss of common understanding.

Social media already provides more diverse viewpoints than traditional media ever has. Even if most of our friends are like us, we all know people with different interests, beliefs and backgrounds who expose us to different perspectives. **Compared with getting our news from the same two or three TV networks or reading the same newspapers with their consistent editorial views, our networks on Facebook show us more diverse content**.

But our goal must be to help people see a more complete picture, not just alternate perspectives. We must be careful how we do this. Research shows that some of the most obvious ideas, like showing people an article from the opposite perspective, actually deepen polarization by framing other perspectives as foreign. A more effective approach is to show a range of perspectives, let people see where their views are on a spectrum and come to a conclusion on what they think is right. Over time, our community will identify which sources provide a complete range of perspectives so that content will naturally surface more.

**Accuracy of information is very important**. We know there is misinformation and even outright hoax content on Facebook, and we take this very seriously. We've made progress fighting hoaxes the way we fight spam, but we have more work to do. We are proceeding carefully because there is not always a clear line between hoaxes, satire and opinion. In a free society, it's important that people have the power to share their opinion, even if others think they're wrong. Our approach will focus less on banning misinformation, and more on surfacing additional perspectives and information, including that fact checkers dispute an item's accuracy.

While we have more work to do on information diversity and misinformation, I am even more focused on the impact of sensationalism and polarization, and the idea of building common understanding. **Social media is a short-form medium where resonant messages get amplified**

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

**many times**. This rewards simplicity and discourages nuance. At its best, this focuses messages and exposes people to different ideas. At its worst, it oversimplifies important topics and pushes us towards extremes.

Polarization exists in all areas of discourse, not just social media. It occurs in all groups and communities, including companies, classrooms and juries, and it's usually unrelated to politics. **In the tech community, for example, discussion around AI has been oversimplified to existential fear-mongering**. **The harm is that sensationalism moves people away from balanced nuanced opinions towards polarized extremes**.

If this continues and we lose common understanding, then even if we eliminated all misinformation, people would just emphasize different sets of facts to fit their polarized opinions. That's why I'm so worried about sensationalism in media.

Fortunately, there are clear steps we can take to correct these effects. For example, we noticed some people share stories based on sensational headlines without ever reading the story. In general, if you become less likely to share a story after reading it, that's a good sign the headline was sensational. If you're more likely to share a story after reading it, that's often a sign of good in-depth content. We recently started reducing sensationalism in News Feed by taking this into account for pieces of content, and going forward signals like this will identify sensational publishers as well. **There are many steps like this we have taken and will keep taking to reduce sensationalism and help build a more informed community.**

Research suggests the best solutions for improving discourse may come from getting to know each other as whole people instead of just opinions -- something Facebook may be uniquely suited to do. If we connect with people about what we have in common -- sports teams, TV shows, interests -- it is easier to have dialogue about what we disagree on. When we do this well, we give billions of people the ability to share new perspectives while mitigating the unwanted effects that come with any new medium.

A strong news industry is also critical to building an informed community. Giving people a voice is not enough without having people dedicated to uncovering new information and analyzing it. There is more we must do to support the news industry to make sure this vital social function is sustainable -- from growing local news, to developing formats best suited to mobile devices, to improving the range of business models news organizations rely on.

**Connecting everyone to the internet is also necessary for building an informed community**. For the majority of people around the world, the

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

debate is not about the quality of public discourse but whether they have access to basic information they need at all, often related to health, education and jobs.

**Finally, I want to emphasize that the vast majority of conversations on Facebook are social, not ideological. They're friends sharing jokes and families staying in touch across cities. They're people finding groups, whether they're new parents raising kids or newly diagnosed patients suffering from a disease together. Sometimes it's for joy, coming together around religion or sports. And sometimes it's for survival, like refugees communicating to find shelter**.

Whatever your situation when you enter our community, **our commitment is to continue improving our tools to give you the power to share your experience**. By increasing the diversity of our ideas and strengthening our common understanding, our community can have the greatest positive impact on the world.

**Civically-Engaged Community**

Our society will reflect our collective values only if we engage in the civic process and participate in self-governance. There are two distinct types of social infrastructure that must be built:

The first encourages engagement in existing political processes: voting, engaging with issues and representatives, speaking out, and sometimes organizing. Only through dramatically greater engagement can we ensure these political processes reflect our values.

The second is establishing a new process for citizens worldwide to participate in collective decision-making. Our world is more connected than ever, and we face global problems that span national boundaries. As the largest global community, Facebook can explore examples of how community governance might work at scale.

The starting point for civic engagement in the existing political process is to support voting across the world. It is striking that only about half of Americans eligible to vote participate in elections. This is low compared to other countries, but democracy is receding in many countries and there is a large opportunity across the world to encourage civic participation.

In the United States election last year, we helped more than 2 million people register to vote and then go vote. This was among the largest voter turnout efforts in history, and larger than those of both major parties combined. In every election around the world, we keep improving our tools to help more people register and vote, and we hope to eventually enable hundreds of

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

millions of more people to vote in elections than do today, in every democratic country around the world.

Local civic engagement is a big opportunity as well as national. Today, most of us do not even know who our local representatives are, but many policies impacting our lives are local, and this is where our participation has the greatest influence. Research suggests reading local news is directly correlated with local civic engagement. This shows how building an informed community, supportive local communities, and a civically-engaged community are all related.

Beyond voting, the greatest opportunity is helping people stay engaged with the issues that matter to them every day, not just every few years at the ballot box. We can help establish direct dialogue and accountability between people and our elected leaders. In India, Prime Minister Modi has asked his ministers to share their meetings and information on Facebook so they can hear direct feedback from citizens. In Kenya, whole villages are in WhatsApp groups together, including their representatives. In recent campaigns around the world -- from India and Indonesia across Europe to the United States -- we've seen the candidate with the largest and most engaged following on Facebook usually wins. Just as TV became the primary medium for civic communication in the 1960s, social media is becoming this in the 21st century.

This creates an opportunity for us to connect with our representatives at all levels. In the last few months, we have already helped our community double the number of connections between people and our representatives by making it easier to connect with all our representatives in one click. When we connect, we can engage directly in comments and messages. For example, in Iceland, it's common to tag politicians in group discussions so they can take community issues to parliament.

Sometimes people must speak out and demonstrate for what they believe is right. From Tahrir Square to the Tea Party -- our community organizes these demonstrations using our infrastructure for events and groups. On a daily basis, people use their voices to share their views in ways that can spread around the world and grow into movements. The Women's March is an example of this, where a grandmother with an internet connection wrote a post that led her friends to start a Facebook event that eventually turned into millions of people marching in cities around the world.

Giving people a voice is a principle our community has been committed to since we began. As we look ahead to building the social infrastructure for a global community, we will work on building new tools that encourage thoughtful civic engagement. Empowering us to use our voices will only become more important.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

**Inclusive Community**

Building an inclusive global community requires establishing a new process for citizens worldwide to participate in community governance. I hope that we can explore examples of how collective decision-making might work at scale.

**Facebook is not just technology or media, but a community of people**. That means we need Community Standards that reflect our collective values for what should and should not be allowed. **In the last year, the complexity of the issues we've seen has outstripped our existing processes for governing the community**. We saw this in errors taking down newsworthy videos related to Black Lives Matter and police violence, and in removing the historical Terror of War photo from Vietnam. We've seen this in misclassifying hate speech in political debates in both directions -- taking down accounts and content that should be left up and leaving up content that was hateful and should be taken down. Both the number of issues and their cultural importance has increased recently.

This has been painful for me because I often agree with those criticizing us that we're making mistakes. These mistakes are almost never because we hold ideological positions at odds with the community, but instead are operational scaling issues. Our guiding philosophy for the Community Standards is to try to reflect the cultural norms of our community. When in doubt, we always favor giving people the power to share more.

There are a few reasons for the increase in issues we've seen: cultural norms are shifting, cultures are different around the world, and people are sensitive to different things.

**First, our community is evolving from its origin connecting us with family and friends to now becoming a source of news and public discourse as well**. With this cultural shift, our Community Standards must adapt to permit more newsworthy and historical content, even if some is objectionable. For example, an extremely violent video of someone dying would have been marked as disturbing and taken down. However, now that we use Live to capture the news and we post videos to protest violence, our standards must adapt. **Similarly, a photo depicting any child nudity would have always been taken down -- and for good reason -- but we've now adapted our standards to allow historically important content like the Terror of War photo**. These issues reflect a need to update our standards to meet evolving expectations from our community.

Second, our community spans many countries and cultures, and the norms are different in each region. It's not surprising that Europeans more

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

frequently find fault with taking down images depicting nudity, since some European cultures are more accepting of nudity than, for example, many communities in the Middle East or Asia. With a community of almost two billion people, it is less feasible to have a single set of standards to govern the entire community so we need to evolve towards a system of more local governance.

Third, even within a given culture, we have different opinions on what we want to see and what is objectionable. I may be okay with more politically charged speech but not want to see anything sexually suggestive, while you may be okay with nudity but not want to see offensive speech. Similarly, you may want to share a violent video in a protest without worrying that you're going to bother friends who don't want to see it. And just as it's a bad experience to see objectionable content, it's also a terrible experience to be told we can't share something we feel is important. This suggests we need to evolve towards a system of personal control over our experience.

**Fourth, we're operating at such a large scale that even a small percent of errors causes a large number of bad experiences**. We review over one hundred million pieces of content every month, and even if our reviewers get 99% of the calls right, that's still millions of errors over time. **Any system will always have some mistakes, but I believe we can do better than we are today**.

**I've spent a lot of time over the past year reflecting on how we can improve our community governance**. Sitting here in California, we're not best positioned to identify the cultural norms around the world. Instead, we need a system where we can all contribute to setting the standards. Although this system is not fully developed, I want to share an idea of how this might work.

The guiding principles are that the Community Standards should reflect the cultural norms of our community, that **each person should see as little objectionable content as possible**, and each person should be able to share what they want while being told they cannot share something as little as possible. The approach is to combine creating a large-scale democratic process to determine standards with AI to help enforce them.

The idea is to give everyone in the community options for how they would like to set the content policy for themselves. Where is your line on nudity? On violence? On graphic content? On profanity? What you decide will be your personal settings. We will periodically ask you these questions to increase participation and so you don't need to dig around to find them. For those who don't make a decision, the default will be whatever the majority of people in your region selected, like a referendum. Of course you will always be free to update your personal settings anytime.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

With a broader range of controls, content will only be taken down if it is more objectionable than the most permissive options allow. Within that range, content should simply not be shown to anyone whose personal controls suggest they would not want to see it, or at least they should see a warning first. Although we will still block content based on standards and local laws, our hope is that this system of personal controls and democratic referenda should minimize restrictions on what we can share.

**It's worth noting that major advances in AI are required to understand text, photos and videos to judge whether they contain hate speech, graphic violence, sexually explicit content, and more**. **At our current pace of research, we hope to begin handling some of these cases in 2017, but others will not be possible for many years**.

Overall, it is important that the governance of our community scales with the complexity and demands of its people. **We are committed to always doing better**, even if that involves building a worldwide voting system to give you more voice and control. Our hope is that this model provides examples of how collective decision-making may work in other aspects of the global community.

**This is an important time in the development of our global community, and it's a time when many of us around the world are reflecting on how we can have the most positive impact**.

History has had many moments like today. As we've made our great leaps from tribes to cities to nations, we have always had to build social infrastructure like communities, media and governments for us to thrive and reach the next level. At each step we learned how to come together to solve our challenges and accomplish greater things than we could alone. We have done it before and we will do it again.

**I am reminded of President Lincoln's remarks during the American Civil War: "We can succeed only by concert. It is not 'can any of us imagine better?' but, 'can we all do better?' The dogmas of the quiet past, are inadequate to the stormy present. The occasion is piled high with difficulty, and we must rise with the occasion. As our case is new, so we must think anew, act anew."**

**There are many of us who stand for bringing people together and connecting the world. I hope we have the focus to take the long view and build the new social infrastructure to create the world we want for generations to come**.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

It's an honor to be on this journey with you. Thank you for being part of this community, and thanks for everything you do to make the world more open and connected.

Mark

https://www.weforum.org/agenda/2017/02/mark-zuckerberg-building-a-global-community-that-works-for-everyone/ (emphasis added).

67.     In fact, at the time this was written, Meta employees were already reporting to management that Facebook was causing harmful dependencies. Meta was already marketing to children under 13, despite clear legal mandates that it could not allow children under 13 on its social media product. And Meta leadership, Mr. Zuckerberg himself, was actively rejected proposed re-designs intended to minimize the harms to child and teen users, users like Brantley Aranda.

68.     Meta's recommendation-based feeds and product features were promoting harmful content. Meta's algorithms are programmed to prioritize number of interactions and not quality of interactions. Worded otherwise, Meta promotes and amplifies content based on engagement objectives and not the health and well-being of their users, which renders its social media products inherently dangerous and defective, particularly when used by teens and children.

69.     Meta exerts unprecedented levels of manipulation and control over users and is knowingly directing harmful content to users as a matter of its algorithmic programming and settings Meta chooses as part of its prioritization of engagement over user safety.

70.     And while certain of Meta's systems and designs necessarily involve and/or incorporate advertising and third-party content, it is the Meta product itself and not the ads or content causing user harm. That it is, it is not content harming millions of Meta users, but rather, the extreme and calculated way in which Meta identifies and amplifies such content in its effort to increase engagement.

71.     Meta also, at the same time CEO Mark Zuckerberg was touting the importance and helpful function of Meta's group recommendations algorithm, was recognizing internally the massive number of truly harmful and horrific groups on its social

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

media platform – and the fact that its algorithm was directing users, including children and teens, to these harmful groups. That is, these children and teens would never have been exposed to such harmful content but for Meta's systems and its programming of those systems to prioritize engagement over user safety.

72.     Moreover, Meta has conducted social comparison studies, *see, e.g.*, *Social Comparison: Topics, celebrities, Like counts, selfies* (January 2021) and *Appearance Based Social Comparison on Instagram* (February 2021),[7] to identify the types of algorithmically promoted content most harmful to social media users, and the degree of harm that content causes. Meta routinely identifies harmful categories, then just as routinely determines that promotion of such content is a large part of what makes social media products appealing to teens. Meta decides against making its current product safer as a result. In other words, the promotion of harmful content has become so central to Meta's business models that Meta regularly opts to conceal the truth and continue harming users instead of making its products safer and less harmful.

73.     Facebook profile and privacy settings also cause harm. Users' profiles on Facebook may be public or private, which is a product feature over which Meta exercises complete control. On public profiles, any user can view the photos, videos, and other content posted by the user. On private profiles, the user's content may only be viewed by the user's followers, which the user must approve. At all times relevant, Facebook profiles were public by default and Facebook allowed all users to message and send follow requests to underage users. But even now, when Meta claims that it is defaulting certain categories of users on certain of its social media products into private profiles, all a user need do is change the profile setting and, once again, Meta will allow all users to message and send follow requests to underage users. Meta can protect users from this specific harm, can do so immediately, and chooses to not do so as a matter of engagement and growth.

74.     Permitting public profiles for underage users serves no critical purpose in

---

[7] *See* https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

terms of product functionality but, instead, it increases user engagement during onboarding (when a user first starts using a social media product) by increasing user connections and generally by providing all users with greater access to other users, in this case, irrespective of their age. Unfortunately for young children and teens, a numerically significant percentage of those would-be connections are harmful. Defendants are aware of these harms and have opted to not make necessary and cost-effective changes to prevent it.

75.     Meta's Messenger settings also permit and encourage harm to vulnerable users. Harmful and dangerous interactions occur because of the Facebook Messaging product, which is integrated with the Facebook app.  Specifically, Meta's chosen settings provide predators and other bad actors with direct and unsupervised access to children and teens. Again, however, Meta opts for engagement over safety.

76.     Meta's push notifications and emails encourage addictive behavior and are designed specifically to increase use of its social media products. In the case of Instagram, Defendant Meta collects individualized data – not just about the user, but also about the user's friends and contacts – and then selects content and notification frequency for its users and notifies them via text and email. Meta's notifications to individual users are specifically designed to, and do, prompt them to open Instagram and view the content Instagram selected, increasing sessions, and resulting in greater profits to Instagram. More to the point, even the format of these notifications has been designed and re-designed with the specific purpose of pulling users back onto the social media platform—irrespective of a user's health or wellbeing.

77.     Facebook also incorporates several product features that serve no functionality purpose, but that do make Meta's product more appealing to children and teens, such as "likes" and in-app games, while simultaneously increasing social comparison pressure and resulting harm. The harm from these product features does not relate to a single "like" or filter, or any specific series of content or potential content.  Rather, it is the product itself. Meta knows that its products are causing harm.

78.     Facebook also creates images and GIFs for users to post on their videos and

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

pictures. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Facebook. The GIFs, images, and music are integral to the user's Facebook post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's Facebook post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. A Facebook user who incorporates images, GIFs or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement and more profits for Meta itself.

79.     Meta directly profits from the content its users create in collaboration with Meta, as described above.

80.     Meta knows that it is harming teens yet, when faced with recommendations that will reduce such harms, Meta's leadership consistently opts for prioritization of profit over the health and well-being of its teen users—that is, the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

81.     Meta's products are used by many millions of children every day.

**B.     Meta's Applications Are Products**

82.     There is no dispute that the Facebook social media product is designed and manufactured by Meta and further, Meta refers to Facebook as a product.

83.     Meta's social media products are designed to be used by minors and are actively marketed to minors across the United States. Meta markets to minors through its own marketing efforts and design, and through their approval and permission to advertisers

who create and target ads to young users. Internal Meta documents establish that Meta spends millions of dollars researching, analyzing, and experimenting with young children to find ways to make its product more appealing and addictive to these age groups, as these age groups are seen as the key to Meta's long-term profitability and market dominance.

C.   **Meta's Business Model is Based on Maximizing User Screen Time and Meta Knows That Facebook is Addictive**

84.   Meta and its leadership have repeatedly represented to the public and governments around the world that their Facebook product is safe and not addictive

85.   In February of 2017, Meta founder and CEO Mark Zuckerberg made the lengthy "Building Global Community" post on his personal Facebook (*see supra*) in which he talked at length about how Meta is focused on safety, how it intends to use its AI to the fullest to keep users safe, and how amazing Facebook is for bringing communities together and promoting critically important social groups.

86.   In September of 2017, Meta founder and CEO Mark Zuckerberg spoke out on the issue of opioid addiction, making general addiction-related statements, including that "Communities all across the country have a long road ahead, but as someone told me at the end, 'I'm hopeful because we're talking about it.' Me too." [8]

87.   In April of 2018, Meta founder and CEO Mark Zuckerberg testified under oath to Congress that Meta does not design its products to be addictive and that he is not concerned with social media addiction as it relates to teens. He stated,

> I view our responsibility as not just building services that people like but as building services that are good for people and good for society as well … we study a lot of effects of well-being, of our tools, and broader technology, and like any tool there are good and bad uses of it. What we find in general is that if you are using social media to build relationships then that is associated with all the long term measures of well-being that you'd intuitively think of … but if you are using the internet and

---

[8] https://www.northpointrecovery.com/blog/mark-zuckerberg-discusses-view-addiction-facebook/

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

social media to just passively consume content and are not engaging with other people then it doesn't have those positive effects and it could be negative.[9]

88.     These are just some examples of the representations Meta was making to users, and the Plaintiffs in this case, about the safety of its Facebook social media product.

89.     In truth, Meta had been studying its "addicting" product mechanics during these same time frames and Meta leadership—including and specifically Meta CEO Mark Zuckerberg—had actual knowledge that its Facebook product was addictive and harmful to children and teens.

90.     In fact, in 2017 Meta was actively attending and presenting at an annual conference held in Silicon Valley starting in 2014, known as the Habit Summit and the stated purpose of which was to teach product manufacturers how to make their products more habit forming. Meta not only knew that Facebook was addictive, it designed it that way.

91.     Meta's tests during those same periods of time were confirming that Meta already knew … which is that many teen users felt like they were physically unable to stop using Facebook, even though they had begun to realize that it was not good for them.

92.     Meta was fully aware that its Facebook product was addictive, and also, that this this "Facebook addiction" was having the greatest impact on millions of U.S. teens.

93.     In short, Meta employees and Meta leadership know that Facebook is addictive and harmful, in part, because it was designed that way (addictive design) and, also, because the billions of dollars Meta has spent researching user addiction has said so. Meta has never released this information on addiction and/or problematic use to the public; instead, its leadership lied repeatedly to Congress and to parents of its tens of millions of teen users.

94.     Meta advertises its product as "free," because it does not charge its users for downloading or using its product. What many users do not know is that, in fact, Meta makes a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to its users. Meta receives revenue from advertisers who pay a

---

[9] https://www.youtube.com/watch?v=AB4mB-K7-xY

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

premium to target advertisements to specific demographic groups of users in the applications including, and specifically, users under the age of 18. Meta also receives revenue from selling its users' data to third parties

95.     The amount of revenue Meta receives is based upon the amount of time and user engagement on its platforms, which directly correlates with the number of advertisements that can be shown to each user. In short, Meta opted for user engagement over the truth and user safety

96.     Facebook is built around a series of design features that do not add to the communication and communication utility of the application, but instead seek to exploit users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards (including things like "likes" and "followers" and "views"). This design is unreasonably dangerous to the mental well-being of underage users' developing minds and was harmful to Brantley Aranda.

97.     Meta has also employed thousands of engineers to help make its products maximally addicting. One example is Facebook's "pull to refresh" feature, which is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry, and prevent natural end points that would otherwise encourage users to move on to other activities

98.     Meta does not warn users of the addictive design of its product. On the contrary, Meta actively conceals the dangerous and addictive nature of its product, lulling users and parents into a false sense of security – as it did with Blair and Gregorio Aranda. This includes consistently playing down its products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make its research public or available to academics or lawmakers who have asked for it.

99.     Meta spends billions of dollars marketing its products to minors and has deliberately traded in user harm for the sake of its already astronomical revenue stream.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

**D.**    **Defendants Have Designed Complex Algorithms to Addict Teen Users and Their Business Models Are Based on Maximizing User Screen Time**

100.    Meta has intentionally designed its product to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to the largest technology companies in the world.

101.    Meta has designed and progressively modified its product to promote problematic and excessive use that they know is indicative of addictive and self-destructive use. More specifically, Meta knows that many teens feel as though they cannot stop their use of Meta's product, even though they want to stop.

102.    One of these features, present in Facebook, is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never ending "feed." Meta is well-aware that algorithm-controlled feeds promote unlimited "scrolling"— a type of use those studies have identified as detrimental to users' mental health. However, this type of use allows Meta to display more advertisements and obtain more revenue

103.    Meta has also designed algorithm-controlled feeds to promote content most likely to increase user engagement, which often means content that Meta knows to be harmful to its users. This is content that users might otherwise never see but for Meta's affirmative pushing of such content to their accounts.

104.    In the words of one, high-level departing Meta employee,

> In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.
>
> The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

"Why We Build Feeds" (October 4, 2019), at p. 1.[10]

105.    The addictive nature of Meta's product and the complex and psychologically manipulative design of its algorithms is unknown to ordinary users. It was unknown to Plaintiffs as well.

106.    Meta goes to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making knowingly false public statements about the safety of its product.

107.    Meta also has developed unique product features that are designed to limit, and that do limit, parents' ability to monitor and prevent problematic use by their children.

108.    Meta's addiction-driven algorithms are designed to be content neutral. They adapt to the social media activity of individual users to promote *whatever* content will trigger a particular user's interest and maximize their screen time. That is, prior to the point when Meta has addicted its user and is then able to influence user preferences, its algorithm designs do not distinguish, rank, discriminate, or prioritize between types of content. For example, if the algorithm can increase User One engagement with elephants and User Two engagement with moonbeams, then Meta's algorithm design will promote elephant content to User One and moonbeam content to User Two. Meta's above-described algorithms are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users – as long as those promotions increaser user engagement.

**B. Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

109.    The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and

---

[10] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

impulse control.

110.    The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

111.    During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

112.    In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

113.    The algorithms in Meta's social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Meta knows that because its minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Meta has failed to design its product with any protections to

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

account for and ameliorate the psychosocial immaturity of its minor users. On the contrary, Meta specifically designs its product with these vulnerabilities in mind.

**E.     Meta Misrepresents the Addictive Design and Effects of Facebook**

114.    At all times relevant, Meta has advertised and represented that its Facebook product is appropriate for use by teens and has stated in public comments that its product is not addictive and was not designed to be addictive. Meta knows that those statements are untrue.

115.    Meta did not warn users or their parents of the addictive and mentally harmful effects that the use of its product was known to cause amongst minor users, like Brantley Aranda. On the contrary, Meta has gone to significant lengths to conceal and/or avoid disclosure of the true nature of its product.

**F.     Plaintiffs Expressly Disclaim Any and All Claims Seeking to Hold Meta Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties**

116.    Plaintiffs seeks to hold Meta accountable for its own alleged acts and omissions. Plaintiffs' claims arise from Meta's status as the designer and marketer of dangerously defective social media products, as well as Meta's own statements and actions, not as the speaker or publisher of third-party content.

117.    Meta has designed its product to be addictive. For example, Meta has developed and modified product features like the continuous loop feed and push notifications, to incentivize users to stay on its Facebook product as long as possible and to convince users to log back on. Meta's algorithm even calculates the most effective time to send such notifications, which in the case of teen users often means in the middle of the night and/or during school hours. Essentially, the times they are least likely to have access to Meta's social media product, which also—as Meta knows—are the times that their health and well-being necessitate them not being on Meta's social media product. Meta's product is designed to and does addict users on a content neutral basis, and it addicted Brantley Aranda on a content neutral basis.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

118.    Meta's algorithm structure is by itself harmful to users, again, irrespective of content. For example, a primary purpose of Meta's algorithm design is to determine individual user preferences first so that Meta can then influence user behavior and choices second—which is particularly dangerous in the case of teens.

119.    It is clear from Meta's records that Meta uses its product both to "experiment" on and test its users in ways heretofore unimagined, but also, it seeks to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users.

120.    On a content neutral basis, the manipulation and control Meta knowingly wields over its users daily is profoundly dangerous.

121.    Meta's Integrity Team employees regularly provide Meta leadership with warnings and recommendations, which Meta leadership regularly ignores. As explained in the employee departure memos previously discussed, Meta imposes insurmountable hurdles when it comes to making their existing and in-development products safer, while it imposes no user safety requirements when it comes to making its products more engaging.

122.    Meta is responsible for these harms. These harms are caused by Meta's designs and design-decisions, and not any single incident of third-party content. Meta's Integrity Team employees flagged these issues for Meta leadership countless times and were consistently ignored.

123.    Meta failed to warn minor users and their parents of known dangers arising from anticipated use of its Facebook product. These dangers are unknown to ordinary consumers but are known to Meta and its employees. Moreover, these dangers do not arise from third-party content contained on Meta's social media platform. This lawsuit does not involve a suit against a web browser provider for making available third-party content.

124.    While it may be a third-party creates a particular piece of harmful content, the teens harmed by Facebook are not being harmed by a single piece of harmful content. They are being harmed by the dependency Meta engineers as well as Facebook's algorithmic programming and business decisions to show teens a constant barrage of harmful content to

obtain more advertising revenue and increase engagement

125.    Brantley Aranda and children like him do not open Facebook accounts in the hopes of becoming addicted. Nonetheless, such children *do* become addicted, leading them to engage in foreseeable addict behaviors, such as lying to their parents, hiding their use of Facebook, losing control and becoming irritable, and feeling like they want to stop using Facebook but being unable to stop to the point where they continue to keep using even though they want to stop. These and other behaviors can and do result in serious harm to Facebook's minor users

126.    Brantley Aranda and children like him do not start using Facebook in the hopes of being exposed to product features that cause harm to them. Yet Facebook use involves harmful forms of social comparison and inevitably pushes such children towards harmful "rabbit holes," causing anxiety, depression, anger, self-harm, and suicidal ideation—harms Meta itself has acknowledged repeatedly in internal documents.

127.    The harms at issue in this case do not relate to or arise from third party content, but rather, Meta's product features and designs, including algorithms that (a) addict minor users to Meta's product; (b) amplify and promote harmful social comparison through Instagram product features; (c) affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity; and (d) put minor users in contact with unknown, adult users. Indeed, the foregoing are merely examples of the kinds of harms at issue in this case

128.    Meta's product is addictive on a content neutral basis. Meta designs and operates its algorithms in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content.

129.    Meta has designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Meta's product. This includes but is not limited to Meta's failure to check identification or verify validity of user-provided email credentials,

while simultaneously implementing product design features (such as easier ability to switch between accounts) to ensure easy access by children and teens, irrespective of consent.

130.    In fact, the *only* reason Brantley Aranda was allowed to have a Facebook account at the age of 16 was because Plaintiff Blair Aranda knew that his friends were opening Facebook accounts without parental consent via school device. Blair Aranda knew that she could not physically prevent him from opening a Facebook account and using Meta's social media product, as Facebook's design made such protection of her son impossible.

131.    Meta also promotes, encourages, and/or otherwise contributes to the development of harmful content. This Complaint quotes from just a few of the thousands of Meta documents disclosed by the Facebook Whistleblower, which establish this – and Plaintiffs believe they will uncover tens of thousands more through discovery in this case.

132.    Meta also approves ads that contain harmful content, for example, and as discussed at the Senate hearing held on October 5, 2021,[11]

---

[11] https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

**Senator Mike Lee: (01:21:34)**
Now, since that exchange happened last week, there are a number of individuals and groups, including a group called the Technology Transparency Project or TTP, that have indicated that that part of her testimony was inaccurate. That it was false. TTP noted that TTP had conducted an experiment just last month, and their goal was to run a series of ads that would be targeted to children ages 13 to 17, to users in the United States. Now, I want to emphasize that TTP didn't end up running these ads. They stopped them from being distributed to users, but Facebook did in fact approve them. As I understand it, Facebook approved them for an audience of up to 9.1 million users, all of whom were teens.

**Senator Mike Lee: (01:22:31)**
I brought a few of these to show you today. This is the first one I wanted to showcase. This first one has a colorful graphic encouraging kids to, "Throw a Skittles party like no other," which as the graphic indicates, and as the slang jargon also independently suggests, this involves kids getting together randomly to abuse prescription drugs. The second graphic displays an ana tip. That is a tip specifically designed to encourage and promote anorexia. It's on there. Now the language, the ana tip itself independently promotes that. The ad also promotes it in so far as it was suggesting. These are images you ought to look at when you need motivation to be more anorexic, I guess you could say. Now the third one invites children to find their partner online and to make a love connection. "You look lonely. Find your partner now to make a love connection."

133.     In other words, Meta approves advertisements "designed to encourage and promote anorexia," encouraging children to abuse prescription or illegal drugs, and other clearly harmful and dangerous content, which ads Meta then targets specifically at children in exchange for payment from the advertisers.

134.     Meta utilizes private information of its minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors."[12] Again, Meta specifically selects and pushes this harmful content, for which it is then paid, and does so both for that direct profit and also to increase user engagement, resulting in more profits down the road. "That's

---

[12]  *See*   https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript. ("October 5, 2021, Senate Hearing Transcript"), Mr. Chairman Blumenthal at 00:09:02.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

how [Meta] can push teens into darker and darker places."[13] Meta "knows that its amplification algorithms, things like engagement based ranking ... can lead children ... all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time."[14] Meta has knowledge that its product and the content they are encouraging and helping to create is harmful to young users and chooses "profits over safety." [15]

135.    Meta has information and knowledge that can determine with reasonably certainty each user's age, habits, and other personal information, regardless of what information the user provides at the time of account setup. Meta can also determine on a mass scale and with reasonably certainty which of its users are teens, regardless of what information they provide at the time of account setup. Meta has used this capability for its own economic gain. The Facebook Papers reference various technologies Meta has developed for this precise purpose over the last several years.

136.    None of Plaintiffs' claims rely on treating Meta as the publisher or speaker of any third party's words or content. Plaintiffs' claims seek to hold Meta accountable for its own allegedly wrongful acts and omissions, not for the speech of others or for Meta's good faith attempts to restrict access to objectionable content.

137.    Plaintiffs are not alleging that Meta is liable for what the third parties said, but for what Meta did.

138.    None of Plaintiffs' Claims for Relief set forth herein treat Meta as a speaker or publisher of content posted by third parties. Rather, Plaintiffs seek to hold Meta liable for its own speech and its own silence in failing to warn of foreseeable dangers arising from anticipated use of its product. Meta could manifestly fulfill its legal duty to design a reasonably safe social media product and furnish adequate warnings of foreseeable dangers arising out of the use of its products without altering, deleting, or modifying the content of a

---

[13] *Id.*
[14] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen at 00:37:34.
[15] *Id.* at 02:47:07.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

single third- party post or communication. Some examples include,

    a.  Not using its addictive and inherently dangerous algorithm in connection with any account held by a user under the age of 18.

    b.  Not permitting any targeted advertisements to any user under the age of 18.

    c.  Fixing or removing all features that currently do not implement the tools Meta uses to identify and remove harmful content (particularly since Meta knows that its algorithms and other systems are pushing these higher risk features disproportionately to protected classes).

    d.  Prioritizing internally its removal of harmful content over the risk of losing some user engagement (as Meta represents it does already but, in fact, does not) – *i.e.* users who might be offended when Meta takes down what it believes to be harmful content.

    e.  Requiring identification upon opening of a new account, and restricting users under the age of 18 to a single account.

    f.  Requiring verification by email when a user opens a new account. Not requiring verification allows underage users to access Facebook and does not stop bad actors. Meta employees have recognized this shortcoming and have recommended change.

    g.  Immediate suspension of accounts where Meta has reason to know that the user is under the age of 13, including when the user declares that they are under the age of 13 in their bio or comments and where Meta determines an "estimated" age of under 13 based on other information it collects; and not allowing the account to resume until the user provides proof of age and identity and/or parental consent.

    h.  Suspension of accounts where Meta has reason to know that the user is over the age of 18, but where they are providing information to suggest that they are minors and/or are representing themselves as minors to other Instagram users; and not allowing the account to resume until the user provides proof of age and identity

    i.  Launching Project Daisy, meaning that each user could see their own likes but would be unable to see the likes on any other user's posts and comments.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

j.   Instituting advertising safeguards to ensure that Meta is not profiting directly from or otherwise pushing or endorsing harmful advertising content.

k.   Requiring that all teen user accounts be set to private and not allowing any user under the age of 18 to change user settings to public.

l.   Not permitting direct messaging with any user under the age of 18 if that minor user is not already on a user's friend list.

m.   Requiring parental consent and restricting account access for users under the age of 18 to prevent usage at night and during regular school hours.

139.   These are just some examples, all of which could be accomplished easily and/or at commercially reasonable cost. Meta itself has discussed and considered many of these, but its leadership ultimately declined to make such product changes because such changes—while better for the health and wellbeing of Facebook users—could result in a relatively small decrease to Meta's more than $200 billion in annual revenue.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

**G.    Brantley Aranda's Death was Proximately Caused by Defendants' Social Media Products**



140.    Brantley Aranda was born December 30, 2001, and grew up in Jonesboro, Louisiana.

141.    He was extremely smart, creative, funny, and loved learning. As a child he was his parents' and grandparents' tag along, always observing what other people were doing and always trying to help. When he was about two years old, a pest control company sprayed

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

for bugs. Afterwards, Brantley went from window to window pretending to spray for bugs. When he got a bit older his parents got him his own set of hammers, to help his pepaw around the house and he followed Pepaw everywhere trying to help – and occasionally hitting himself or his Pepaw with the hammer instead of whatever it was he wanted to fix.

142.   Brantley wanted to be a fighter pilot when he grew up and doted on his two younger brothers up until the he died. All three boys were born in December, and Brantley often told his brothers that they were the best birthday and Christmas presents he ever got.

143.   Brantley got his first cell phone in 2016, for his 15th birthday; however, that device did not have internet access. When Plaintiff Blair Aranda called the provider (AT&T) she told them that she just needed a phone for texting and calls, and not the internet.

144.   The Aranda family also had a family computer; however, Brantley was not allowed to use the computer for social media, and he was only allowed to use it when his parents were around. The boys would earn computer time with chores, for example, fifteen minutes for cleaning their room or an hour for mowing, and even more time if they went over to their grandparents' house (Memaw and Pepaw) to help.

145.   To their knowledge, Brantley did not open his first Facebook account until May of 2018, when he was 16 years old. But Plaintiffs cannot be certain as Meta designs its products to evade parental authority and control.

146.   What Plaintiffs do know is that Brantley had some computer access at school in his 8th grade year, but that access was limited. Things changed when Brantley started 9th grade, however, as everything was then done on computers and the kids were allowed access to the internet once their assignments were complete. Unfortunately for Plaintiffs' Blair and Gregorio Aranda, Brantley was a strong student and often finished his assignments quickly – which meant considerable internet access via school devices.

147.   Blair Aranda complained to the school, but nothing changed.

148.   In May of 2018, Brantley Aranda was telling his mother about how all his friends were opening social media accounts, without their parents' knowledge, and were accessing those accounts at school. Because it was May, Brantley had finished most of his

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

testing, which meant that he had even more time to be on the school computers unsupervised.

149.    To obtain some control over Brantley's use of social media and because Blair Aranda understood from Meta's marketing and public statements, as well as its Community Guidelines and other representations about safety and use of technology to enforce its rules and keep children safe, Plaintiff Blair Aranda told Brandley that he could open a Facebook account. She told him that she would need to always have access to his password and that his use would be limited. Brantley enthusiastically agreed and, to his parents' knowledge, this is when he opened his first Facebook account – May of 2018.

150.    Discovery on Facebook will be required to confirm whether this was, in fact, his first Facebook account – as Meta's social media product design permits children to create accounts with parental permission or oversight.

151.    Either way, Brantley still did not have internet access on his cell phone, so the only social media access known to his parents at that time was during earned computer time and, of course, at school when he was allowed to use school devices. It is unknown whether Brantley was using any of his friends' devices or other sources to access social media, though Meta will have this information and it can also be obtained in discovery.

152.    Brantley's Facebook use coincided with a gradual but steady decline in his mental health. He went from a confident and outgoing young man to someone who was uncomfortable in social situations and anxious. It was a slow but steady change, and Plaintiffs could not identify the source. Brantley had become addicted to social media.

153.    Unbeknownst to Plaintiffs, Facebook's harmful social comparison products and the constant and harmful images Meta pushed to Brantley via algorithms and targeted advertising – actions for which Facebook profited as direct result – were having a foreseeable and harmful impact on Brantley's self-image and self-esteem, resulting in some anxiety, difficulty with focus, and, in retrospect, likely even thoughts of suicide and self-injury. These are the precise types of harms Meta identified *internally* as harms use of its social media products can cause, including and specifically as among young users.

154.    Meta knew that its Facebook product could and was causing this harm but

failed to disclose any of its findings on these issues outside the confines of its company. On the contrary, it fostered a corporate culture of silence by fear. *See, e.g. infra*, FBP 32/13, *Comms FYI on New York Times story* (January 2020), p. 2-7, FBP 02/02, *departure letter*, dated September 7, 2020, p. 20.

155.    Meta also knew or should have known that it was causing this harm to Brantley, including based on his usage information and patterns—which Meta collects and closely tracks—and content to which it was repeatedly exposing him via unsolicited methods, such as content Facebook pushes to its young users. This was not communication between multiple users, but advertisements and similar content Meta alone was pushing to Brantley as part of its business model and product operations.

156.    More to the point, Meta has designed its proprietary systems in a manner that enables Meta to benefit incredibly from its algorithmic programming and the content it directs to young users; whereas, on information and belief, Meta may or will claim that it cannot now ascertain the precise programming and or content utilized in connection with individual users. Discovery as to Meta's systems and its retention policies and processes, as well as the design of its systems to benefit from but not retain certain data points, will be material in this case – and material to finding out precisely what Meta is doing to American teens. Nonetheless, there is ample evidence and admissions in the Facebook Papers, which make clear that Meta was knowingly pushing harmful content to children in manners and quantities Meta itself recognized as being inherently dangerous for user health and wellbeing.

157.    Meta prioritized profits over the well-being of a substantial number of children to whom it was marketing and providing its social media products. In the words of the Facebook whistleblower, Meta is morally bankrupt – and the Facebook papers prove it.

158.    In or about April 2019, Brantley began having issues with his cell phone. Texts to his girlfriend were not going through. Brantley tried a factory reset of his device in late April 2019, but it the issue did not resolve.

159.    In or about May 2019, Brantley got a new cell phone and this one had internet access. He was 17 years old at the time.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

160.     Plaintiff Blair Aranda tried to discourage Facebook use on his new cell phone by telling Brantley that they had a limited phone plan, and that it would cost more if he used the internet. Brantley quickly figured out that this was not the case.

161.     Plaintiffs Blair and Gregorio Aranda also spoke with Brantley about the dangers of the internet. This was not a social media specific discussion, because they did not know that Facebook itself was the greatest danger to their son.

162.     Blair and Gregorio cautioned their son to stay away from pornography, and to not trust or engagement with strangers. When it came to video games, Blair Aranda observed as Brantley did not engage with and ignored strangers who tried to engage with him.  She hoped and trusted that he would use the same judgment when it came to the internet more generally. She did not like that he had internet access, and she still did not like that he had any social media accounts at all – she did not fully understand social media but knew that she could not stop him based on how Defendants designed their products.

163.     Saying no to social media was not a choice Meta provided to Plaintiffs, nor is it a choice Meta provides to any parent. Meta makes its products available to underage children and teens and designs its products to thwart parental control and consent.

164.     When Brantley got his new phone, Plaintiffs also instituted rules to make sure that Brantley would go to sleep instead of staying up on his phone. He had to plug his phone in at a location he could not reach from his bed, and Blair Aranda would often check in on Brantley at night when she was up late.

165.     At first, his phone was across the room. Then Brantley asked if he could plug it in on a high shelf next to his bed, as that was the location of his outlet. Blair agreed but continued to check in on him from time to time.

166.     While Blair Aranda never caught her son awake and on his phone in the middle of the night, she now knows that this is precisely what Brantley was doing. After Brantley's death, Blair discovered that he had been up at all hours–often as late as 4 a.m.–on Facebook and Facebook Messenger, which resulted in sleep deprivation and mental harm.

167.     Meta tracks usage of its social media products and, on that basis, had actual

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

knowledge of this excessive and harmful use by a minor user.

168.   Meta also affirmatively promotes and amplifies harmful content to users and did so to Brantley. To name only one example, in June of 2019 Brantley and his then-girlfriend broke up. Just after the breakup, Brantley told Blair Aranda that Facebook had started to show him articles and content about relationships, things with titles like "How to keep your relationship." This content was unwanted by Brantley and caused emotional harm. Brantley did not want or search for this content; instead, Meta's controlled and pushed this content to Brantley based on its exploitation of Brantley's most private and personal data. It did so as part of a calculated attempt to increase Brantley's usage of and dependency on its Facebook social media product.

169.   Meta had also been making recommendations to Brantley and others in Brantley's "friend" network since he first opened a Facebook account. These recommendations included Facebook groups and content, as well as Facebook users Meta determined it should connect with Brantley and/or members of his "friend" network which then often, and because of how Meta designs its recommendation algorithms, would recommend those persons to Brantley directly.  The user recommendations are made by a product called "People You May Know" or "PYMK."

170.   In Brantley's case, these Meta products – the recommendation algorithms – were promoting and amplifying to Brantley harmful users, user groups, and content specific recommendations – including adult and minor users who began encouraging Brantley to engage in self-harm and even suicide. These are individuals and content Brantley would never have been exposed to but for Meta's recommendation products and decisions to promote these specific users and groups, and this specific content to Brantley.

171.   As Brantley's Meta-driven exposure to these harms increased, so did his mental health, in a manner that was both foreseeable by Meta and fatal to Brantley.

172.   In the summer of 2019, Brantley started complaining of shortness of breath and other symptoms. Plaintiffs were not certain whether these were the result of him vaping (which habit they did not know about until the summer of 2019) or his anxiety, or both.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

Plaintiffs took Brantley to specialists in the hopes of finding out what was wrong.

173.   Brantley's parents became increasingly worried about a possible heart condition, but doctors found nothing wrong other than orthostatic hypertension, and told him to eat more salt.

174.   In June 2019, Blaire Aranda learned that Brantley had engaged in self-harm. His parents put him in counseling, hoping to get to the bottom of what was happening. Again, they did not know about his social media dependency, or the harmful content being directed to him by Meta, and without this information, counseling was not enough. Brantley was becoming more dependent on Facebook and was on Facebook and Facebook Messenger all hours of the day and night, without his parents' knowledge or consent.

175.   What Meta knew or should have known, but Plaintiffs did not know and could not reasonably have discovered, is that Brantley was severely sleep deprived and had become increasingly withdrawn and anxious because of his Facebook dependency and the multiple features and functions of the Facebook product designed to encourage that dependency – all for the sake of Meta's growing and astronomical profits.

176.    In fact, Meta was also sending Brantley emails and push notifications in the middle of the night, while he was in school, and at other times designed to affirmatively push Brantley to log back into Facebook and to increase his dependency on the Facebook social media product – which is what happened. Internal Meta documents confirm these design objectives.

177.   What Meta also knew or should have known, but Plaintiffs did not know and could not reasonably have discovered, is that when you separate an addicted child from social media, for even a few hours, it puts them in vulnerable and emotionally unstable place. This is a foreseeable consequence of addiction.

178.   On September 4, 2019, Brantley Aranda got in trouble for fighting with his brother. Plaintiff Gregorio Aranda took his cell phone as consequence for his behavior.

179.   The family attended Wednesday night church, as the always tried to do, and Blair Aranda noticed Brantley writing something during the sermon, which assumed were

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

notes on the sermon itself. It turned out to be a suicide note.

180.     Brantley asked to go home after church.  Blair stayed to cook food—which was typical after Wednesday night church, through Brantley usually stayed to help. She agreed to let him go home with his grandparents instead, as they live close to Plaintiffs.

181.     Blair Aranda expected Brantley to stay with his grandparents, but he told them that he had homework to do so he returned to Plaintiffs' home instead.

182.     When Blair Aranda arrived home after church, she found Brantley with a bullet in his chest. He was still alive when she found him, but quickly passed. His suicide note read, "I'm sorry for everything."

183.     Brantley Aranda died on September 4, 2019, ten days into his senior year of high school and less than four months after obtaining access to the Facebook social media product on a personal cell phone device.

184.     The harmful dependency Meta knowingly created, and the harmful content Meta promoted and amplified via its recommendation systems and algorithms proximately caused Brantley Aranda's death.

185.     Without access to social media, Brantley Aranda had no distraction, only his thoughts and everything he felt like he was going through because of Meta's social media product design and process, its engineered dependency, and the resulting and foreseeable impact of sleep deprivation, depression, and anxiety.

186.     After Brantley's death, Blair Aranda started to look for answers.  She hoped to find out more through Brantley's Facebook activity, so wrote to Facebook and requested his messages. Facebook agreed but when it sent the content none of the memes or photos were included. She asked again but received the same incomplete product in response and was told by Meta that this was the most they would provide.

187.     Blair then went directly to Brantley's Facebook account and took screen shots of every message on Facebook Messenger. It was not until September of 2021, when the Facebook whistleblower came forward, that any of it began to make sense.

188.     Brantley's death was the proximate result of psychic injury caused by his

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

addictive use of Facebook, and as set forth above.

189.   But for Meta's refusal to conduct a reasonable age verification or confirm parental consent for minor users, Brantley Aranda would not have been exposed to the harmful features and design of Meta's Facebook product.

190.   But for certain product features, such as Facebook's "like" feature, Brantley Aranda would not have experienced the anxiety and depression that stem from harmful social comparison designs.

191.   But for Meta's recommendation systems as well as content promotion and amplification, public profile, and direct messaging settings, Brantley Aranda would not have been exposed to users encouraging and content prompting self-harm and suicide – content Meta knew about or should have known about yet recommended and pushed to young and "vulnerable" users like and including Brantley Aranda.

192.   But for Facebook's endless feed and explore features, and other product designs, Brantley Aranda would not have experienced the harmful dependencies that these features were designed to promote.

193.   Throughout the period of Brantley's Facebook use, Plaintiffs were unaware of the addictive and mentally harmful effects of Facebook. There were also not aware of the resulting sleep deprivation and incredibly harmful emotional impact those factors were having on Brantley physical and mental health. They were also not aware of the algorithm products that were affirmatively connected Brantley with and otherwise suggesting and directing him to harmful users, groups, and content – users, groups, and content to which Brantley would not have been exposed by for Meta's affirmative conduct, which was intended to connect Brantley with as many users and groups and as much content as possible as a means of increasing his dependency and engagement to the Facebook product.

194.   Meta designed Facebook to frustrate and prevent parents like Blair and Gregoria Aranda from exercising their rights and duties as parents to monitor and limit their child's use of their social media products.

195.   Meta not only failed to warn Plaintiffs of these dangers, known only to Meta,

but affirmatively misrepresented the safety, utility, and addictive properties of its Facebook product to minor users and their parents in a manner that was designed to, and reasonably did, create reliance on those same minor users and their parents to their detriment.

## VI.    PLAINTIFF'S CLAIMS

### COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

196.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 195 as if fully stated herein.

197.    Under Restatement (Second) of Torts § 402(a) and California law, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

198.    Meta's Facebook product is defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Meta and the omission of the alternative design renders the product not reasonably safe. These defective conditions rendered this product unreasonably dangerous to persons or property and existed at the time the product left Meta's control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of Plaintiffs' injuries.

199.    Meta designed, manufactured, marketed, and sold a social media product that was unreasonably dangerous because it was designed to be addictive to the minor users to whom Meta actively marketed and because the foreseeable use of Meta's Facebook product causes mental and physical harm to minor users.

200.    Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on their product.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

**A. Inadequate Safeguards From Harmful and Exploitative Recommendations and Promotions**

201.    Facebook is defectively designed.

202.    As designed, Facebook algorithms and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that substantially distinguish between harmful and innocuous content and protect minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Meta's social media product. It is also feasible to design a social media product that does not use algorithms in connection with minor user accounts and/or only uses limited algorithms when responding to specific, user-generated inquiries, as opposed to what Meta does now, which is select, promote, amplify, recommend, and organize and present in an overwhelming and harmful manner massive amounts of harmful and exploitative content to teens and children in the interest of engagement and corporate profits. The cost of designing these products to incorporate such safeguards would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

203.    As designed, Facebook algorithms and other product features are not reasonably safe because they affirmatively direct and recommend minor users to harmful Facebook groups and other users, while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that do not make harmful connection recommendations to minor users, or any connection recommendations at all; it is feasible to design and algorithm and technologies that do not recommend harmful Facebook groups to minor users, or any group recommendations at all; and it is feasible to restrict access to minor users by strangers and adult users via direct messaging, to restrict and limit such access to users already on a minor user's "friend" list, or to prevent such access altogether. Facebook knows that these product

features cause a significant number of harms to its minor users, such as sexual exploitation, bullying, and the type of encouragement of self-harm and suicide at issue in this case.

204.    Meta also engages in conduct, outside of the algorithms and related technologies themselves, designed to promote harmful and exploitative content as a means of increasing Meta's revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including teens like Brantley Aranda; and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Meta at the direct cost of user wellbeing.

205.    Reasonable users (and their parents) would not expect that Meta products would knowingly expose them to such harmful content and/or that Meta's products would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Meta has and continues to knowingly use its algorithms and other technologies on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Meta's youngest users.

**B.    Failure to Verify Minor Users' Age and Identity**

206.    Facebook is defectively designed.

207.    As designed, Meta's product is not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

208.    Adults frequently set up user accounts on Meta's social media product posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking.

209.    Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Meta's social media product and pose as minors for malign purposes.

210.    Moreover, reasonably accurate age and identity verification is not only

feasible but widely deployed by online retailers and internet service providers. Meta not only can estimate the age of its users, but it does.

211.   The cost of incorporating age and identify verification into Meta's product would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Meta's product.

**C.     Inadequate Parental Control and Monitoring**

212.   Facebook is defectively designed.

213.   Meta's product is also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

214.   It is feasible to design a social media product that requires parental consent for users under the age of 18 and prohibits users under the age of 13.

215.   Instead, Meta's product is designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.     Intentional Direction of Minor Users to Harmful and Exploitative Content**

216.   Facebook is defectively designed.

217.   Default "recommendations" communicated to new teenage users, including Brantley Aranda, purposefully steered him toward content Meta knew to be harmful to children of his age and gender

218.   Ad content pushed to new teenage users, including Brantley Aranda, because of their age and vulnerability, purposefully steer those users toward content Meta knows to be harmful to children of their age and gender.

**E.     Inadequate Protection of Minors from Sexual Exploitation and Abuse**

219.   Facebook is defectively designed.

220.   Meta's product is not reasonably safe because it does not protect minor users from sexually explicit content and images or report sex offenders to law enforcement or allow users' parents to readily report abusive users to law enforcement.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

221.     Parents do not expect their children will use Meta's product to exchange sexually explicit content and images, and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

222.     Minor users of Meta's product lack the cognitive ability and life experience to identify online grooming behaviors by prurient adults and lack the psychosocial maturity to decline invitations to exchange salacious material.

223.     Meta's product is unreasonably dangerous and defective as designed because it allows minor children to use "public" profiles, in many cases default "public" profiles, that can be mass messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation, and grooming, including the sending of encrypted, disappearing messages and cash rewards through Meta's integrated design features.

**F.     Design of Addictive Social Media Products**

224.     Facebook is defectively designed.

225.     As designed, Meta's social media product is addictive to minor users as follows: When minors use design features such as "likes" it cause their brains release dopamine which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Meta's algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

226.     Addiction is not restricted to a substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors:*

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

*Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rates.

227.   Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

228.   Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is.  Addictive social media use is manifested when a user (10 becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or cases harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

229.   The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists in to assess subjects' social media use using the aforementioned addiction criteria, and is by far the most widely used measure of social media addiction.  Originally designed for Facebook, BFAS has since been generalized to all social media.  BFAS has been translated into dozens of languages, including Chinese, and is used by researchers

throughout the world to measure social media addiction.

230.    BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

231.    You spend a lot of time thinking about social media or planning how to use it.

232.    You feel an urge to use social media more and more.

233.    You use social media in order to forget about personal problems.

234.    You have tried to cut down on the use of social media without success.

235.    You become restless or troubled if you are prohibited from using social media.

236.    You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

237.    Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

238.    Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible (sadness, anxiety, irritability).

a.    Tolerance, the need to spend more time using social media to satisfy the urge.

b.    Inability to reduce social media usages, unsuccessful attempts to quit gaming.

    c.   Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

    d.   Continuing to use social media despite problems.

    e.   Deceiving family members or others about the amount of time spent on social media.

    f.   The use of social media to relieve negative moods, such as guilt or hopelessness.

    g.   and Jeopardized school or work performance or relationships due to social media usage.

239.    Meta's advertising profit is directly tied to the amount of time that its users spend online, and its algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Meta enhances advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that on-line social media platforms are psychologically and neurologically addictive.

240.    It is feasible to make Meta's product less addictive and less harmful to minor users by limiting the frequency and duration of access and suspending service during sleeping hours.

241.    At negligible cost, Meta could design software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours; the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide and other forms self-harm among this vulnerable age cohort.

**G.**    **Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

242.    Facebook is defectively designed.

243.    Meta's product is not reasonably safe as designed because it does not include any safeguards to notify users and their parents of usage that Meta knows to be problematic

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

244.    It is reasonable for parents to expect that social media companies that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Meta to design a product that identifies a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

245.    Meta's product is not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation, exploitation, and other abuses by adult users, Meta has not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users. Meta is aware of these harms.

246.    Meta's entire business is premised upon collecting and analyzing user data and it is feasible to use Meta's data and algorithms to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

247.    Moreover, it is reasonable for parents to expect that platforms such as Facebook, which actively promote its services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger. In fact, it is not just reasonable, it is what Meta was actually doing – it was lulling parents into believe that it was using its technologies and AI to protect their children, not to exploit and profit from them which is what actually happened.

248.    As a proximate result of these dangerous and defective design attributes of Meta's product, Brantley suffered severe and fatal mental harm. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Meta's product until late 2021 at the absolute soonest.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

249.     As a result of these dangerous and defective design attributes of Meta's product, Plaintiffs Blair and Gregorio Aranda have suffered emotional distress and pecuniary hardship due to their child's mental harm resulting from his social media addiction.

250.     Meta is further liable to Plaintiffs for punitive damages based upon the willful and wanton design of its product that was intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Facebook.

**COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)**

251.     Plaintiff reallege each and every allegation contained in paragraphs 1 through 244 as if fully stated herein.

252.     Meta's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Meta's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of Plaintiffs' injury.

253.     Meta's product is unreasonably dangerous and defective because it contains no warning to users or parents regarding the addictive design and effects of Facebook.

254.     Meta's social media product relies on highly complex and proprietary algorithms that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

255.     The magnitude of harm from addiction to Meta's product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

256.     Meta had actual knowledge of such harms.

257.     Meta's product is unreasonably dangerous because it lacks any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

Excessive screen time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

258.    It is feasible for Meta's product to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

259.    Meta knew about these harms, knew that users and parents would not be able to safely use its product without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

260.    As a result of Meta's failure to warn, Brantley Aranda suffered severe mental harm, leading to physical injury and death because of his use of Facebook.

261.    As a result of Meta's failure to warn, Plaintiffs Blair and Gregorio Aranda, suffered emotional distress and pecuniary hardship due to their child's mental harm and death resulting from his harmful and dependent use of Facebook.

262.    Meta is further liable to Plaintiffs for punitive damages based upon its willful and wanton failure to warn of known dangers of its product that was intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Facebook.

**COUNT III – NEGLIGENCE**

263.    Plaintiff reallege each and every allegation contained in paragraphs 1 through 256 as if fully stated herein.

264.    At all relevant times, Meta had a duty to exercise reasonable care and caution for the safety of individuals using its product, such as Brantley Aranda.

265.    Meta owes a heightened duty of care to minor users of its social media product because adolescents' brains are not fully developed, which results in a diminished capacity

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

266.    As a product manufacturer marketing and selling products to consumers, Meta owed a duty to exercise ordinary care in the manufacture, marketing, and sale of its product, including a duty to warn minor users and their parents of hazards that Meta knew to be present, but not obvious, to underage users and their parents.

267.    As a business owner, Meta owes its users who visit Meta's social media platform and from whom Meta's derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

268.    Meta was negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like Brantley Aranda, using its Facebook product.

269.    Meta was negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of its product and levels of problematic use amongst teenage users. Meta has extensive internal research indicating that its product is harmful, causes extensive mental harm and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

270.    Meta was negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use its social media platform and features.

271.    Meta was negligent in failing to fully assess, investigate, and restrict the use of Instagram by adults to sexually solicit, abuse, manipulate, and exploit minor users of its Instagram product.

272.    Meta is negligent in failing to provide users and parents the tools to ensure its social media product is used in a limited and safe manner by underage users.

273.    As a result of Meta's negligence, Brantley Aranda suffered severe mental

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

harm from his use of Facebook.

274.   As a result of Meta's negligence, Plaintiffs Blair and Gregorio Aranda suffered emotional distress and pecuniary hardship due to their child's mental harm and death resulting from his harmful and dependent use of Facebook.

275.   Meta is further liable to Plaintiffs for punitive damages based upon its willful and wanton conduct toward underage users, including Brantley Aranda, whom it knew would be seriously harmed through the use of its social media product.

### COUNT VII – FRAUD and FRAUDULENT CONCEALMENT

276.   Plaintiffs reallege each and every allegation contained in paragraphs 1 through 269 as if fully stated herein.

277.   At all times relevant, Meta designed, developed, operated, marketed, made publicly available, and benefitted from its Facebook social media product and therefore owed a duty of reasonable care to avoid causing harm to those that it used it.

278.   Meta's marketing, promotions, and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the Facebook product was safe, improved social connectivity, and improved the mental and physical health of its users. For example, in February of 2017, Facebook founder and CEO, Mark Zuckerberg, posted a manifesto on his Facebook page titled "Building Global Community," in which he talked at length about how Meta is focused on safety, how it intends to use its AI to the fullest to keep users safe, and how amazing Facebook is for bringing communities together, promoting critically important social groups.

279.   In April of 2018, Meta founder and CEO Mark Zuckerberg testified under oath to Congress that Meta does not design its products to be addictive and that he is not concerned with social media addiction as it relates to teens. He stated

> I view our responsibility as not just building services that people like but as building services that are good for people and good for society as well … we study a lot of effects of well-being, of our tools, and broader technology, and like any tool there are good and bad uses of it. What we find in general is that if you are using social media to build relationships then that is associated with all the long term measures of well-being that you'd intuitively think of … but if you are using the internet and

social media to just passively consume content and are not engaging with other people then it doesn't have those positive effects and it could be negative.[16]

280.    Meta's fraud continued long after Brantley Aranda's death. In November of 2020, for example, Mark Zuckerberg again testified under oath to Congress that Meta does not design its products to be addictive and that research on addictiveness of social media has not been conclusive.[17]

281.    In March of 2021, Mark Zuckerberg testified under oath to Congress that Instagram is not addictive and that it does not cause harm to children and teens.[18]

282.    On September 30, 2021, Meta's Head of Safety, Antigone Davis, testified under oath to Congress that Instagram is not addictive[19] and repeatedly denied the existence of causal research regarding harms to teens from Instagram use and testified that Meta's overreaching goal is child safety: "We work tirelessly to put in place the right policies, products, and precautions so [young users] have a safe and positive experience."[20]

283.    On December 8, 2021, Instagram's president Adam Mosseri provided written testimony and testified under oath to Congress that Instagram is not addictive[21] and he downplayed the significance of the documents disclosed by the Facebook Whistleblower, characterizing Meta's numerous studies as involving input from small numbers of teens and not measuring "causal relationships between Instagram and real-world issues."[22] He testified that Meta's overarching goal is child safety. [23]

284.    Meta's Terms of Use also represent that Meta is "Fostering a positive,

---

[16] https://www.youtube.com/watch?v=AB4mB-K7-xY
[17] https://www.tampafp.com/great-news-facebook-is-not-designed-to-be-addictive-according-to-zuckerberg/
[18] https://www.congress.gov/117/meeting/house/111407/documents/HHRG-117-IF16-Transcript-20210325.pdf, at p. 67, 107, 175.
[19] https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript ("Sept. 30, 2021, Senate Hearing Transcript"), at 2:06:35; *see also id.* at 02:07:44 and 02:07:59 (Ms. Davis also denied that Meta's business model includes getting users engaged for longer amounts of time).
[20] *Id.* at 24:58, 01:47:29, 1:48:07, 1:48:20, 2:10:47, 33:46, and 40:41.
[21] https://www.commerce.senate.gov/2021/12/protecting-kids-online-instagram-and-reforms-for-young-users, recording of December 8, 2021 Senate Hearing.
[22] https://www.commerce.senate.gov/services/files/3FC55DF6-102F-4571-B6B4-01D2D2C6F0D0, written Testimony of Adam Mosseri, Head of Instagram, dated December 8, 2021.
[23] https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

inclusive, and safe environment," and represent that Meta uses its "teams and systems … to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure."

285.   The sheer volume and specificity of these statements are indicative and reflective of the lengths to which Meta leadership was willing to go to deceive and/or mislead a substantial percentage of the global population. Meta leadership fed these sorts of deceptive and/or misleading statements to the public for years, to convince people that its products were safe for use by teenagers, like Brantley Aranda. When in fact, Meta knew that its products were not safe. Meta knew that its products are addictive and harmful to a significant portion of users, including teen girls, like Brantley Aranda.

286.   Meta's public statements and other marketing and advertising materials failed to disclose the truth, in fact, Meta has gone to considerable lengths to conceal the truth. This includes creating a corporate culture that convinced thousands of Meta employees that if they went public with what they knew they would lose their careers, no one would believe them, and that Meta would then lock down internal communications in a manner that would make it impossible for the employees left behind to work toward effectuating change from the inside. When in fact, Meta never intended to allow change from the inside. It intended to pursue engagement and growth at the expense of human lives and did everything it could to hide these facts from the world.

287.   Meta lied about the harm its products are causing.

288.   Meta's omissions were also misleading and deceptive in every respect, for example, talking about how its social media products make some users' lives better and ignoring the fact that its products are causing serious (even fatal) harms to other users. Meta has an internal term, SSI, which stands for Suicide and Self-Injury. Meta was internally discussing the fact that its product worsens and causes Suicide and Self-Injury in some of its youngest users yet failed to disclose and actively concealed this information. SSI stands for Suicide and Self Injury, which is perhaps how Meta leadership slept at night … by ignoring

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

the fact that they were knowingly distributing products that were resulting in the death of children. To name only one example from the Facebook Papers:

289.    In September of 2017, former Meta CEO, Sheryl Sandberg, was asked about a Meta product that enabled advertisers to target users with offensive terms. In response, Meta CEO, Sheryl Sandberg, apologized and vowed that the company would adjust its ad-buying tools to prevent similar problems in the future. She also represented that "We never intended or anticipated this functionality being used this way — and that is on us."[24]

290.    What the former Meta CEO deliberately failed to mention was that the identified product defect was among the less harmful of countless defects known to Meta at that time. She failed to tell the public that Meta was aware of the harms its products were causing, including Suicide and Self-Injury harms, but refused to implement safety tools and other cost-effective fixes for fear of decreasing engagement and, in turn, corporate profits.

291.    Meta had actual knowledge of the harms its Facebook product was causing, knew or should have known that it was causing those harms to Brantley Aranda, and made a deliberate decision to continue the course regardless. Meta could have prevented Brantley's death, a death Meta itself caused, but chose engagement and growth instead.

292.    Meta failed to disclose, and spent years actively concealing, the fact that its Facebook social media product causes addiction, sleep deprivation, anxiety, depression, anger, self-harm, suicidal ideation, and suicide, among other harms.

293.    These representations were false and material, as were Meta's omissions. These representations were communicated to Plaintiffs via the media, the internet, advertising, websites, and the platforms themselves and Plaintiffs reasonably relied on these representations to their detriment. Meta intended for members of the public, including plaintiffs, to rely on these misrepresentations and omissions, and Plaintiffs did, and these misrepresentations and omissions were a substantial factor in causing Plaintiffs' harm.

---

[24] https://www.nytimes.com/2017/09/21/technology/facebook-frankenstein-sandberg-ads.html

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Meta for relief as follows:

a)  Past physical and mental pain and suffering of Brantley Aranda, in an amount to be more readily ascertained at the time and place set for trial;

b)  Loss of enjoyment of life, in an amount to be more readily ascertained at the time and place set for trial;

c)  Past medical care expenses for the care and treatment of the injuries sustained by Brantley Aranda, in an amount to be more readily ascertained at the time and place set for trial;

d)  Past and future impairment to capacity to perform everyday activities;

e)  Plaintiff's pecuniary loss and loss of Brantley Aranda's services, comfort, care, society, and companionship to Blair and Gregorio Aranda;

f)  Loss of future income and earning capacity of Brantley Aranda;

g)  Punitive damages;

h)  Reasonable costs and attorney and expert/consultant fees incurred in prosecuting this action; and

i)  Such other and further relief as this Court deems just and equitable.

Dated: July 20, 2022.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC


By:*/s/ Laura Marquez-Garrett*
Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
Matthew Bergman
matt@socialmediavictims.org
Glenn Draper
glenn@socialmediavictims.org

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549

SEEGER WEISS LLP
Christopher A. Seeger
cseeger@seegerweiss.com
Christopher Ayers
cayers@seegerweiss.com
55 Challenger Road
Ridgefield Park, NJ 07660
Telephone: 973-639-9100
Facsimile: 973-679-8656

Robert H. Klonoff
klonoff@usa.net
2425 S.W. 76th Ave.
Portland, Oregon 97225
Telephone: (503) 702-0218
Facsimile: (503) 768-6671

*Attorneys for Plaintiffs*

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP